JIPYONG LLC
Jinhee Kim (CA Bar No. 238928)
Mary Kosman (MD Bar No. 1312180108)
Somin Jun (IL Bar No. 6329889)
Yong Ik Lee (NY Bar No. 5718143)
26F, Grand Central A, 14 Sejong-daero
Jung-gu, Seoul 04527, Republic of Korea
Telephone: (213) 321-2479, +82-2-6200-1782
Facsimile: +82-2-6200-0811
jinheekim@jipyong.com
marykosman@jipyong.com
smjun@jipyong.com
yilee@jipyong.com

Attorneys for Plaintiff
SolarPark Korea Co., Ltd.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SOLARPARK KOREA CO., LTD.<br><br>                                        Plaintiff<br><br>        v.<br><br>THE SOLARIA CORPORATION,<br>COMPLETE SOLARIA, INC., and<br>DOES 1 THROUGH 10<br><br>                                        Defendants. | Civil Action No. 4:23-cv-01181<br><br>**COMPLAINT FOR:**<br><br>**(1) Misappropriation of Trade Secrets**<br>**(2) Defamation**<br>**(3) Tortious Interference with<br>    Contractual Relations**<br>**(4) Inducement to Breach of Contract**<br>**(5) Violation of California's Unfair<br>    Competition Law**<br>**(6) Civil Conspiracy**<br>**(7) Injunctive Relief** |

Plaintiff SolarPark Korea Co., Ltd. ("Plaintiff") brings this complaint for injunctive relief and other remedies against defendants The Solaria Corporation ("Solaria"), Complete Solaria, Inc. ("Complete Solaria") and Does 1 through 10 (collectively with Solaria and Complete Solaria, "Defendants") and alleges as follows:

### NATURE OF ACTION

1.      This is an action for injunctive relief, restitution and compensatory damages based on a civil conspiracy involving misappropriation of trade secrets, defamation, interference with contractual relations, and inducement of breach of contract, among others.  Because of Defendants' tortious and unlawful conduct, Plaintiff suffered more than $220 million in damages, and its sole business of solar module manufacturing is on the brink of a permanent shutdown.

2.      This lawsuit is separate and distinct from a pending arbitration before the Singapore International Arbitration Centre ("SIAC") between Plaintiff and Defendant Solaria (Case No., ARB/160/22/WXZ, the "Arbitration").  Solaria initiated the Arbitration prematurely and preemptively to achieve the conspiratorial goal alleged in this complaint.  Claims and counterclaims raised in the Arbitration do not overlap with claims asserted in this action.  Plaintiff's causes of action here are independent of issues to be decided by the arbitral tribunal, and SIAC's jurisdiction does not extend to defendants other than Solaria.

3.      As to Solaria, its contract with Plaintiff provides "exclusive jurisdiction and venue" for _any_ equitable relief in any state or federal court in Alameda County, California.  (*See* Solar Module Sales Agreement dated August 4, 2019 (the "MSA") redacted and attached hereto as Exhibit A "Ex. A")).  This action seeks such equitable relief against Solaria as well as other defendants.

### PARTIES

4.      Plaintiff is a company incorporated and operating in Korea with its principal place of business at 292, 300 Wanjusandan 6-ro, Bongdon-eup, Wanju-gun, Jeollabuk-do, 55316, Republic of Korea.

5.      Defendant Solaria is a company incorporated in the state of Delaware with its principal place of business at 45700 Northport Loop East, Fremont, CA 94538.  Solaria is believed to be a wholly owned subsidiary of defendant Complete Solaria.

6.      Defendant Complete Solaria is a company incorporated in the state of Delaware with its principal place of business at 45700 Northport Loop East, Fremont, CA 94538.

7.      Plaintiff is presently unaware of the true identities of defendants Does 1 through 10 and therefore sues them by such fictitious names.  Plaintiff will seek leave of this Court to amend

1    the complaint if and when their identities have been ascertained.

2    **JURISDICTION AND VENUE**

3    8.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) as the

4    amount in controversy exceeds $75,000 and the case is brought by a citizen of a foreign state against

5    two identified defendants who are citizens of California and other unidentified defendants who are

6    believed to be residents of a U.S. state.   Thus, complete diversity exists.

7    9.    Additionally, this Court has jurisdiction pursuant to 28 U.S.C. § 1331 as Plaintiff's

8    first and the most predominant cause of action arises under the Defend Trade Secrets Act of 2016

9    ("DTSA") 18 U.S.C. § 1836 and this Court may exercise supplemental jurisdiction over the state

10   law claims as they arise from the same nucleus of operative facts.

11   10.    Venue is proper under 28 U.S.C. § 1391(b)(1) as all identified defendants reside in

12   this judicial district.  Additionally, Plaintiff and Defendant Solaria entered into a contract which

13   provides, "The exclusive jurisdiction and venue… shall be any state or federal court in Alameda

14   County, California" for any proceeding for equitable relief for breach of "confidentiality, exclusivity,

15   intellectual property or other proprietary rights."  (Ex. A, § 18.5).

16   **DIVISIONAL ASSIGNMENT**

17   11.    Pursuant to Civil L.R. 3-2(c), this case should be assigned to the Oakland Division

18   because a substantial part of the events giving rise to the claim occurred in Alameda County and the

19   agreement between Solaria and Plaintiff provides exclusive jurisdiction and venue for equitable

20   relief in Alameda County.  (Ex. A, § 18.5).

21   **FACTS COMMON TO ALL CAUSES OF ACTION**

22   12.    Plaintiff has been in the business of manufacturing solar modules since 2008.

23   Plaintiff has manufactured and supplied solar modules to the world's top solar power companies

24   such as SunEdison Inc., SolarWorld AG, and Suntech America.  Plaintiff operates two factories in

25   Wanju, South Korea, which have 5 production lines for the production of solar modules.  Factory

26   No. 1 has 3 production lines, and 2 lines are in Factory No. 2.

27   13.    Defendant Solaria is allegedly "an industry leader in the design, development, and

28   manufacture of silicon photovoltaic (PV) products, including high-efficiency modules." (Ex. A, §

3<br>COMPLAINT

1). Solaria developed a new "shingling" technology which involves cutting solar cells into shingles and overlapping them as they are packed into a solar module. Solar modules manufactured using this technology are considered more advanced than conventional solar modules which currently make up about 98% of the solar module market.

14.   In 2015, Plaintiff and Solaria began exploring a business partnership. Although Solaria developed the shingling technology, it did not have the capability to mass produce shingled solar modules. Plaintiff, on the other hand, had the capability, experience, and a global repute in mass production.

15.   On April 8, 2016, Solaria and Plaintiff entered into an Agreement to Manufacture (the "2016 Agreement"). Under the 2016 Agreement, Plaintiff agreed to supply solar modules and dedicate one of its production lines solely to Solaria. Plaintiff's four other production lines continued to manufacture conventional solar modules for other customers.

16.   To convert a production line to manufacture Solaria's shingled modules, most of the existing front-end equipment needed to be removed and replaced with new equipment. Plaintiff converted one of the lines in Factory No. 2 and developed a unique know-how in mass producing solar modules using Solaria's shingling technology (the "Manufacturing IP"). Plaintiff began supplying modules to Solaria in September 2016 and continued to improve its Manufacturing IP with enhanced technology as it continued to manufacture Solaria's product until December 2021.

17.   On October 6, 2018, Solaria and Plaintiff entered into a Technology License Agreement (the "TLA") setting forth detailed terms and conditions of licensing their respective intellectual property ("IP") to one another. (*See* Technology License Agreement dated October 6, 2018 attached hereto as Exhibit B ("Ex. B")). The TLA also included strict confidentiality provisions concerning the use or disclosure of each other's IP. (Ex. B, § 6).

18.   Sometime in or around April 2019, Solaria proposed to expand its partnership with Plaintiff and ramp up production by operating three new lines dedicated to Solaria's product. Replacing three production lines and converting the entire Factory No. 1 to shingling technology required an investment of approximately $60 million. Solaria's proposal also required Plaintiff to double its manpower.

19.     Accepting Solaria's proposal meant that Plaintiff would rely almost entirely on Solaria's orders to sustain Plaintiff's business because shingled modules comprised only about 2% of the total solar module market, yet Plaintiff would be left with only one production line for conventional modules.  However, Solaria's proposal also came with a yearly minimum purchase commitment for five years, which would enable Plaintiff to recoup the equipment and facility investment within the first year and maintain a profitable business.

20.     In this vein, Solaria and Plaintiff entered into an Agreement for Supply dated June 20, 2019 (the "2019 Agreement").  Under §§ 2.2 and 3.4 of the 2019 Agreement, Solaria agreed to purchase an agreed minimum volume of 224 MW per year for five years through June 2024, which meant that Plaintiff could expect to earn approximately USD 100 million per year for 5 years.

21.     A few weeks later, Solaria and Plaintiff executed the MSA on August 4, 2019, further memorializing their agreement to ramp up production of Solaria's shingled solar modules.  The MSA expressly superseded the 2016 Agreement, but not the TLA.  (Ex. A, § 1).  It provided that "[a]bsolute quantity conditions applied for each quarter" and that Plaintiff would provide a volume discount if more than 164,656 modules were purchased each quarter. (Ex. A, §5.2(c)).

22.     The MSA also allocated various investment costs between Plaintiff and Solaria.  For instance, Solaria was responsible for purchasing certain front-end equipment for $6.4 million to be consigned to Plaintiff until fully paid for.  (Ex. A, § 3.2).  Plaintiff was responsible for purchasing all other equipment necessary for the conversion, with the exception of certain back-end equipment for which Solaria made an advance payment of $2 million to be recouped through a rebate on the first 1 million modules purchased.  (Ex. A, §§ 3.2, 3.4).

23.     The MSA made it clear that it was Plaintiff that owned all "SPK Manufacturing IP" which refers to "all intellectual property rights… owned or controlled by Plaintiff which pertain to [Plaintiff's] general manufacturing expertise, equipment, and processes..." (Ex. A, § 2.14).  Similar to the TLA, the MSA also contained detailed confidentiality provisions.  (Ex. A, § 12).  According to the MSA, confidential information is "any information disclosed by either party…which is designated as "Confidential," "Proprietary" or some similar designation."  (Ex. A, § 12.1).  Each party agreed not to disclose confidential information to third parties and not to use it other than as

5

is necessary to perform under the MSA.  (Ex. A, § 12.2).  Any actual or threatened violation of the confidentiality provisions entitled the non-breaching party to seek injunctive relief.  (Ex. A, § 12.4).

24.    Under the MSA, termination at will was not allowed during the first three years unless the other party was unable to perform their obligations under the agreement.  (Ex. A, § 14.1). To terminate the MSA at will, the terminating party was required to provide a sixty-day written notice and there was a minimum wind-down period of 180 days.  (*Id.*)  Termination for cause is allowed if the other party is unable to perform or in breach of the MSA.  (Ex. A, § 14.2).

25.    Shortly after executing the 2019 Agreement, Plaintiff converted the three production lines in Factory No. 1 to produce Solaria's product exclusively.  In so doing, Plaintiff invested approximately $40 million worth of equipment and approximately $20 million worth of manufacturing facilities for the Solaria business.

26.    Solaria, however, could not meet the agreed volume of orders.  Rather than ramping up production as it had proposed and promised, Solaria's purchase orders steadily declined through 2020 and 2021.  The three production lines dedicated to Solaria were being far too under-utilized to maintain the extra manpower, and Solaria's purchase volume was far too low to sustain factory operation, let alone recoup the investment.

27.    As Solaria's orders continuously remained below the critical threshold, Plaintiff suggested in October 2021 that Solaria advance $2 million toward future purchases so that Plaintiff could pay the workers' wages to keep the lines operational in November and December of 2021. Solaria agreed to make the advance payment to prevent layoffs of key personnel, but ultimately paid roughly $0.5 million less than was necessary to maintain Plaintiff's workforce.  Consequently, Plaintiff had no choice but to temporarily shut down Factory 1 on December 31, 2021.

28.    On January 19, 2022, Solaria sent a letter to Plaintiff purporting to terminate the MSA as of February 18, 2022 on the basis that Plaintiff was unable to perform its obligations. Following Plaintiff's protest against improper termination, the parties exchanged several drafts of "Letter of Intent for the execution of a Manufacturing Agreement and the Mutual Release of Claim and a Stock Purchase Agreement" (the "LOI") in February 2022.

29.    The main purpose of the LOI was to restart production and compensate Plaintiff for

the losses incurred from Solaria's failure to order sufficient volumes.  Plaintiff and Solaria exchanged several drafts of the LOI, and an agreement was reached between the Chief Executive Officers of the two companies.  However, after reporting the deal to certain stakeholders, Solaria reneged on the agreed terms of the LOI at the stakeholders' direction.  No further agreement was reached to operate or salvage Plaintiff's production lines.

30.     On June 28, 2022, Solaria sent a notice of termination purporting to terminate the TLA as of August 31, 2022 on the basis that Plaintiff was unable to pay its debts as they became due and ceased to conduct business.

31.     Solaria's reasons for terminating the MSA and the TLA were mere pretexts.  Upon information and belief, Defendants found its contractual obligations toward Plaintiff too onerous or unattractive to perform and decided to repudiate all preexisting contracts with Plaintiff.  Plaintiff also believes that making a clean slate for Solaria was a precondition for a contemplated merger with a special purpose acquisition company ("SPAC") listed with the United States Securities Exchange Commission (the "SEC").

32.     Indeed, on October 3, 2022, Freedom Acquisition I Corporation ("FACT") – a SPAC listed on the SEC that made an initial public offering of $345 million on March 3, 2021 – announced its planned merger with Solaria and Complete Solar Holding Corporation ("Complete Solar"). According to the Business Combination Agreement filed with the SEC the following day, Solaria and Complete Solar were to merge and form Complete Solaria before the SPAC merger on or before March 2, 2023.  That deadline was later extended to June 2, 2023 by the FACT shareholders' vote.

33.     About one month later on November 7, 2022, Complete Solar and Solaria merged to form Complete Solaria, of which Solaria became a wholly owned subsidiary.  According to FACT's Form S-4 Registration Statement with the SEC filed on February 9, 2023 (the "S-4" attached hereto as Exhibit C ("Ex. C")), the equity value of Complete Solaria after the planned SPAC combination is estimated at $888 million.  (Ex. C. pp. 154, 261).

34.     Moreover, according to Complete Solaria's investor presentation on February 13, 2023, Complete Solaria projected a 187% increase in solar module and system deployments from

2022 to 2023 as a result of the SPAC merger,[1] and expected $132 million in revenues from solar module sales in 2023.[2] Complete Solaria claimed to have "diversified supply chain with module manufacturing in India and Vietnam and cell manufacturing in Cambodia, Thailand, and India."[3]

35.    Plaintiff believes and thereon alleges that Solaria conspired with Complete Solaria (previously Complete Solar) to cut off all of Solaria's ties and obligations to Plaintiff and replace Plaintiff with cheaper suppliers which have no experience manufacturing shingled solar modules. Plaintiff further believes and thereon alleges that Defendants have already provided, are in the process of providing, Plaintiff's intellectual property including, but not limited to, the SPK Manufacturing IP to enable other solar module manufacturers to instantly mass produce Solaria's product.

36.    In an attempt to induce or justify Solaria' unlawful termination of contracts with Plaintiff, Defendants caused FACT to publish false statements concerning Plaintiff. For instance, according to the S-4 filed with the SEC on February 9, 2023 (Ex. C, p. F-138):

> In December 2021, the Company determined that it would no longer utilize Solar Park Korea Co., Ltd. ("Solar Park"), a contract manufacturer, for production of solar panels. Solar Park was experiencing serious financial issues during the fourth quarter of 2021 and **permanently ceased production in December 2021**. (emphasis added).

37.    The S-4 was false and misleading. Plaintiff had not permanently ceased production as of December 2021.   In any event, the temporary shut down of Plaintiff's factory due to Solaria was not publicly available information and was privy only to Solaria. Plaintiff believes and thereon alleges that Defendants deliberately made such false reprsentation to FACT.

38.    FACT also published the following misstatement in the S-4. (Ex. C, p. F-139).

> As discussed in Notes 14 and 17, **subsequent to December 31, 2021 Solar Park filed for bankruptcy** and in June 2022, the Company filed a notice of arbitration with the Singapore International Arbitration Centre ("SIAC") seeking approximately $47.0 million in damages against Solar Park in connection with the write-downs described above and other costs related to the loss of Solar Park's production and transition to a new provider. Solar Park filed a response with SIAC in June 2022

---

[1] Freedom Acquisition I Corp., Current Report (Form 8-K) (Feb. 13, 2023) at Exhibit 99.1, Slide 15, accessible at https://www.sec.gov/Archives/edgar/data/1838987/000119312523036061/d367241d425.htm.
[2] *Id.* at Exhibit 99.1, Slide 38.
[3] *Id.* at Exhibit 99.1, Slide 34.

asserting damages of approximately $30.0 million against the Company.   The arbitration hearing, is expected to occur during the first half of 2024.   (emphasis added).

39.   Plaintiff has not filed for bankrtupcy and is not bankrupt.  Plaintiff believes and thereon alleges that Defendants deliberately provided such false information to FACT in order to accomplish the planned SPAC merger with FACT.

## **FIRST CAUSE OF ACTION**

### **(Misappropriation of Trade Secrets Against All Defendants)**

(18 U.S.C. § 1836 and Cal. Civ. Code §§ 3426-2426.11)

40.   Plaintiff re-alleges and incorporates by reference each and every allegation set forth above as though fully set forth herein.

41.   Plaintiff's Manufacturing IP is a trade secret.  Plaintiff's Manufacturing IP covers the methods, techniques, and processes required to manufacture shingling solar modules at scale. Plaintiff derives actual economic value from the secrecy of its Manufacturing IP, namely the MSA was executed precisely because of Plaintiff's Manufacturing IP which allowed Solaria to sell its solar modules at a commercial scale.

42.   Plaintiff's Manufacturing IP is related to a product that is used in interstate and foreign commerce.  The Manufacturing IP is related to shingled solar modules which are sold by Solaria and Complete Solaria across throughout the United States and in Europe.

43.   Plaintiff has used reasonable efforts to maintain the secrecy of its Manufacturing IP. As part of the TLA, Plaintiff required Solaria to maintain and protect the secrecy of Plaintiff's confidential information, which includes the Manufacturing IP.  (Ex. B, § 6.2).  As part of the MSA, Plaintiff similarly required Solaria to agree not to use Plaintiff's confidential information except as necessary for the MSA, not to disclose Plaintiff's confidential information to third parties and to take reasonable efforts to protect its secrecy.  (Ex. A, §§ 12.2, 12.3).  The MSA also specifically references the "SPK Manufacturing IP" which covers Plaintiff's intellectual property rights pertaining to its general manufacturing expertise, equipment, and processes.  (Ex. A, § 2.14). Plaintiff owns its Manufacturing IP.  It was Plaintiff who invested the time and effort to perfect the

1  mass production process for shingled solar modules. Under the MSA, Plaintiff "shall continue to

2  own all right, title and interest in and to the SPK Manufacturing IP." (Ex. A, § 11.4).

3      44.   Defendants misappropriated the Manufacturing IP by disclosing or conspiring to

4  disclose the Manufacturing IP to contract with other solar module manufacturers and enable them

5  to instantly mass produce using the new shingling technology.  At the time of the misappropriation,

6  the Manufacturing IP was and still is Plaintiff's trade secret.  Without the use of Plaintiff's

7  Manufacturing IP, Defendants would not be able to procure cheaper suppliers in India, Vietnam,

8  Cambodia, or Thailand necessary to attain the 187% increase in production as contemplated after

9  the SPAC merger.[4]

10      45.   Plaintiff never authorized such use or disclosure of the Manufacturing IP.  Solaria

11  knew or should have known that its knowledge of the Manufacturing IP was acquired under

12  circumstances giving rise to a duty to maintain its secrecy.  Solaria was contractually obligated to

13  maintain the secrecy of the Manufacturing IP.  Complete Solaria and Does 1 through 10 knew or

14  had reason to know that their knowledge of the Manufacturing IP was derived from Solaria who

15  owed a duty to Plaintiff to maintain the secrecy of the Manufacturing IP.  Plaintiff believes and

16  thereon alleges that Defendant Complete Solaria conducted due diligence of Solaria prior to its

17  merger with Solaria.  As part of that due diligence, the MSA and the TLA would have been disclosed.

18  (Ex. A, § 14.8; Ex. B, § 5.4).

19      46.   Plaintiff is entitled to compensatory damages for the misappropriation or threatened

20  misappropriation of its trade secrets, in an exact amount to be proven at trial but no less than $100

21  million.   Plaintiff also seeks compensatory and exemplary damages for any unjust enrichment

22  Defendants derived from their unauthorized disclosure and misuse of Plaintiff's trade secrets, in an

23  exact amount to be proven at trial.  Alternatively, Plaintiff is entitled to payment of a reasonable

24  royalty for the use of the Manufacturing IP under the DTSA and California Uniform Trade Secrets

25  Act ("CUTSA").

26      47.   Plaintiff also seeks injunctive and preliminary injunctive relief pursuant to the MSA,

27

28  [4]  Freedom Acquisition I Corp., Current Report (Form 8-K) (Feb. 13, 2023) at Exhibit 99.1, Slide 15.

COMPLAINT

the TLA, the DTSA, and CUTSA enjoining Defendants from, *inter alia*, (i) using the Manufacturing IP to mass produce shingled solar modules; (ii) disclosing the Manufacturing IP to third parties; and (iii) contracting with solar module producers in India, Vietnam, Cambodia, Thailand, or elsewhere who have not previously produced shingled solar modules using Solaria's shingling technology.

### SECOND CAUSE OF ACTION

### (Defamation Against All Defendants)

48.     Plaintiff re-alleges and incorporates by reference each and every allegation set forth above as though fully set forth herein.

49.     On or about February 9, 2023, Defendants caused to be published numerous false and defamatory statements about Plaintiff and its business by orally and/or in writing making the false statements to FACT who subsequently published the false statements in its Form S-4 Registration Statement that it filed with the SEC.

50.     The statements were that "Solar Park was experiencing serious financial issues during the fourth quarter of 2021 and permanently ceased production in December 2021" and that "As discussed in Notes 14 and 17, subsequent to December 31, 2021 Solar Park filed for bankruptcy…"   A true and correct copy of the false and defamatory statements is attached as Exhibit C at pp. F-138-39.

51.     The statements were made to the SEC and are publicly available on the SEC's Electronic Data Gathering, Analysis, and Retrieval System ("EDGAR").

52.     The statements were false at the time of publication because Plaintiff did not permanently cease production of solar modules in December 2021.  As of December 2021, Plaintiff was only producing Solaria's solar modules.  Because Solaria failed to purchase a sufficient volume of solar modules and refused additional prepayments, Plaintiff temporarily stopped producing Solaria's modules.  The statements were also false at the time of publication because Plaintiff did not file for bankruptcy at any time between 2021 and the present.

53.     Defendants caused the statements to be published without reasonable care to determining whether they were actually true or false.  Whether Plaintiff had filed bankruptcy is publicly available through its corporate registry in Korea.  Defendant Solaria was also directly

notified by Plaintiff via a letter on August 9, 2022, a copy of which is attached hereto as Exhibit D, and which is made a part hereof and incorporated herein by reference, that Plaintiff "is neither insolvent nor unable to pay its debts that become due" and Plaintiff has not "entered into bankruptcy or similar proceedings." Defendant Solaria knew that Plaintiff had not permanently ceased production since it had been in discussions with Plaintiff since January 2022 to resume production of Solaria's panels and was negotiating a letter of intent to resume productive relations as late as February 2022.

54. The false statements were defamatory because it tends to expose Plaintiff to hatred, contempt, ridicule, or shame, discourages others from dealing with Plaintiff, and has a tendency to injure Plaintiff in its business. As a result of the false statements, Plaintiff was harmed because it lost business opportunities. Alternatively, the false statements were defamatory per se because it tends directly to injure Plaintiff in respect to its business by imputing to it general disqualification and imputing something with reference to its business that has a natural tendency to lessen its profits. The false statements were defamatory per se because the defamatory meaning appeared from the language itself.

55. As a result of Defendants' publication of the false statements, Plaintiff has suffered harm to its reputation and is entitled to injunctive relief to prevent further publication of the defamatory statements, an order that Defendants' remove the defamatory statements from the S-4, an order that Defendants' publicly issue a correction of the defamatory statements, as well as general, special, and punitive damages in an amount to be proven at trial but not less than $20 million because the statements constitute defamation.

**THIRD CAUSE OF ACTION**

**(Tortious Interference with Contractual Relations**

**Against Complete Solaria and Does 1 – 10)**

56. Plaintiff re-alleges and incorporates by reference each and every allegation set forth above as though fully set forth herein.

57. On October 6, 2018, Plaintiff entered into the TLA with Solaria. Under the TLA, Solaria retained sole and exclusive ownership to its own intellectual property, and Plaintiff retained

all rights, title and interest in any low-cost high density solar module improvements and its Confidential Information.  (Ex. B, §§ 2.1,2.2).  Both Solaria and Plaintiff were granted a license to each other's respective intellectual property.  (Ex. B, § 2.2).   Both parties were also obligated to protect the secrecy of the confidential information.  (Ex. B, §6.2(a)).  The parties agreed not to disclose the confidential information to third parties other than to employees when necessary to carry out the performance of the TLA and were bound to duties of confidentiality.  (Ex. B, § 6.2(b)).

58.    On August 4, 2019, Plaintiff entered into the MSA with Solaria.  The MSA expressly provides that the TLA "shall remain in full force and effect."  (Ex. A, § 1).  Under the MSA, Plaintiff owned all right title and interest in and to the SPK Manufacturing IP and granted a royalty-free license for use of the "SPK Manufacturing IP in the manufacture, use or other disposition of Products made pursuant to the terms of [the MSA]."  (Ex. A, § 11.4).  The SPK Manufacturing IP was "all intellectual property rights…which pertain to SPK's general manufacturing expertise, equipment and processes…"  (Ex. A, § 2.14).  The MSA also contained a requirement that the parties would not use any confidential information other than was necessary for performance of their obligations under the MSA, would not disclose any confidential information to third parties, and would take reasonable measures to protect the information.  (Ex. A, §§ 12.2, 12.3).

59.    At all relevant times, the TLA and MSA were valid and enforceable.

60.    Defendant Complete Solaria and Does 1 through 10 had knowledge of the TLA and the MSA between Plaintiff and Solaria.  Solaria is an indirect wholly owned subsidiary of Complete Solaria.   Defendants sought a merger in order to complete the SPAC merger with FACT and entered into an Agreement and Plan of Merger dated October 3, 2022.  Upon information and belief, Complete Solaria conducted due diligence of Solaria and received disclosures regarding Solaria's business relationship with Plaintiff.

61.    Plaintiff believes and thereon alleges that after learning of the contracts with Plaintiff, Complete Solaria and Does 1 through 10 intended to disrupt the contractual relationship between Solaria and Plaintiff so that Defendants could benefit from (i) awarding supply contracts to cheaper solar module manufacturers; and (ii) making a clean slate for Solaria for the contemplated SPAC merger with FAC.  Complete Solaria and Does 1 through 10 knew that interference with the

13

contractual relationship between Plaintiff and Solaria was certain or substantially certain to occur as a result of their wrongful conduct including inducing Solaria to terminate the existing contracts with Plaintiff, preventing Solaria from executing the LOI to continue to perform under the MSA and the TLA, and disclosing or instructing the disclosure of Plaintiff's Manufacturing IP and other confidential information to third parties.

62.    As a direct result of the interference, Solaria decreased and ceased its orders to Plaintiff and terminated the MSA and the TLA on false pretexts.

63.    As such, Plaintiff is entitled to full restitution of the MSA and TLA.  In the alternative, Plaintiff is entitled to compensatory damages for the losses in suffered resulting from Solaria's unlawful termination of the contracts.  Complete Solaria and Does 1 through 10 are jointly and severally liable for such losses, in an amount to be proven at trial but not less than $100 million.

## FOURTH CAUSE OF ACTION

### (Inducement to Breach Contract Against Complete Solaria and Does 1 Through 10)

64.    Plaintiff re-alleges and incorporates by reference each and every allegation set forth above as though fully set forth herein.

65.    On October 6, 2018, Plaintiff entered into the TLA.  Under the TLA, Solaria retained sole and exclusive ownership its intellectual property, and Plaintiff retained all rights, title and interest in any low-cost high density solar module improvements and its Confidential Information. (Ex. B, §§ 2.12.2).  Both Solaria and Plaintiff were granted a license to each other's respective intellectual property.  (Ex. B, §2.2).  Solaria and Plaintiff also were obligated to protect, not disclose, and not use the other's confidential information.   (Ex. B, §6.2).

66.    The TLA could be terminated for breach or upon 60 days written notice in the event that the other party became insolvent or unable to pay its debts as they became due, ceased to conduct business, or entered into dissolution or liquidation proceedings. (Ex. B, §§ 5.2-5.3).

67.    On August 4, 2019, Plaintiff entered into the MSA with Solaria based on Solaria's assurances that it would order sufficient volume of solar modules to at least meet Plaintiff's breakeven point.  The MSA did not supersede the TLA, which remained in effect.  (Ex. A, § 1). Under the MSA, Plaintiff owned all right title and interest in and to the SPK Manufacturing IP and

granted a royalty-free license for use of the "SPK Manufacturing IP in the manufacture, use or other disposition of Products made pursuant to the terms of [the MSA]" (Ex. A, § 11.4). The SPK Manufacturing IP was "all intellectual property rights…which pertain to SPK's general manufacturing expertise, equipment and processes…" (Ex. A, § 2.14). The MSA also contained a requirement that the parties would not use any confidential information other than was necessary for performance of their obligations under the MSA, would not disclose any confidential information to third parties, and would take reasonable measures to protect the information. (Ex. A, §§ 12.2, 12.3).

68.   The MSA could be terminated for cause if the other party could not perform its obligations or breached an obligation of the MSA. (Ex. A, § 14.2). The MSA could also be terminated for bankruptcy or insolvency. (Ex. A, § 14.3). Finally, the MSA prohibited termination at will during the first three years and only thereafter allowed termination upon a sixty-day written notice and a minimum wind-down period of 180 days. (Ex. A, § 14.1).

69.   At all relevant times, the TLA and MSA were valid and enforceable.

70.   Defendant Complete Solaria and Does 1 through 10 had knowledge of the TLA and the MSA between Plaintiff and Solaria. Solaria is an indirect wholly owned subsidiary of Complete Solaria.  Defendants planned to merge in order to secure a contemplated SPAC merger and entered into an Agreement and Plan of Merger dated October 3, 2022. Upon information and belief, Complete Solaria conducted due diligence of Solaria and received disclosures regarding Solaria's business. Upon information and belief, the contracts with Plaintiff were disclosed as Plaintiff was the sole manufacture of Solaria's PowerXT® solar modules and Solaria was in a contractual dispute with Plaintiff at the time. Upon information and belief, Defendants determined that the contracts with Plaintiff were a liability which would hamper their efforts to secure a SPAC company and go public.

71.   Solaria breached the MSA and the TLA by wrongfully terminating the agreements in violation of the contractual provisions governing termination and by disclosing Plaintiff's Manufacturing IP and confidential information to third parties.

72.   Complete Solaria and Does 1 through 10 intended to induce Solaria's breach of the

MSA and the TLA so as to create a clean slate for Solaria before the planned merger with FACT. Complete Solaria and Does 1 through 10 knew that breach of the MSA and the TLA was certain or substantially certain to occur as a result of its wrongful conduct.  Shortly before or after wrongfully terminating the MSA and the TLA, Solaria contracted, or attempted to contract, with cheaper manufacturers to replace Plaintiff.  None of these manufacturers had experience manufacturing shingled solar modules.   An obvious consequence of the termination is that Solaria would breach the confidentiality provisions of the MSA and the TLA by disclosing Plaintiff's Manufacturing IP and confidential information to third parties.

73.    The inducement by Complete Solaria and Does 1 through 10 to breach the MSA and the TLA was a substantial factor in causing Plaintiff to suffer significant loss of profits it would otherwise make but for the wrongful termination.  Plaintiff would have, at a minimum, been entitled to profits from the agreed supply of shingled solar modules to Solaria.

74.    As such, Plaintiff is entitled to full restitution of the MSA and TLA.  In the alternative, Plaintiff is entitled to compensatory damages for the losses in suffered resulting from Solaria's unlawful termination of the contracts.  Complete Solaria and Does 1 through 10 are jointly and severally liable for such losses, in an amount to be proven at trial but not less than $100 million.

## FIFTH CAUSE OF ACTION

### (Violation of California's Unfair Competition Law as Against All Defendants)

### (Cal. Bus. & Prof. Code §§ 17200-210)

75.    Plaintiff realleges and incorporates by reference each and every allegation set forth above as though fully set forth herein.

76.    In California, unlawful, unfair, and fraudulent business acts or practices are prohibited.  Unlawful business acts or practices are those that violate Federal or California law. Unfair business acts or practices are those that violate antitrust laws or policies or otherwise have a significant adverse impact on competition.  Finally, fraudulent business acts or practices are those that are likely to deceive members of the public.  Plaintiff must have suffered an injury in fact and have lost money and property to bring a claim for violation of California's Unfair Competition Law ("UCL").

77.     Defendants have engaged in an unlawful business act by misappropriating Plaintiff's Manufacturing IP in violation of the DTSA and CUTSA.    Plaintiff owned and maintained the secrecy of its Manufacturing IP.  Defendants disclosed the Manufacturing IP to third parties for the purpose of securing other contract manufacturers to supply its products.  Defendant Solaria disclosed the Manufacturing IP with knowledge that it was under a contractual duty to maintain the Manufacturing IP's secrecy.  Complete Solaria and Does 1 through 10 disclosed the Manufacturing IP with knowledge that Solaria acquired the Manufacturing IP from Plaintiff and owed Plaintiff a contractual duty to maintain its secrecy.

78.     Defendants' publication of defamatory statements also constitutes an unlawful business act in that they violate common law and Cal. Civ. Code. §§ 45, 45a and/or 46.  Defendants published false and defamatory statements to FACT and caused the defamatory statements to be filed with the SEC.  The defamatory statements falsely claimed that Plaintiff filed bankruptcy and permanently ceased production.  As a result, Plaintiff's business and reputation was injured.

79.     Defendant Complete Solaria has engaged in an unlawful business act by tortiously interfering with Plaintiff's contractual relationship with Solaria and inducing a breach of Plaintiff's contract with Solaria.  Defendant was aware of the contracts between Plaintiff and Solaria but interfered with the relationship and induced Solaria to breach the contracts so that it could merge with Solaria and ultimately pursue a merger with FACT.

80.     As a direct result of Defendants' violations of the UCL, Plaintiff has been injured and lost money and property.  Due to Defendants' misappropriation, Plaintiff has lost its trade secrets.  Because the trade secrets have been disclosed to third parties, their value has been diminished because their value came from secrecy.  Due to Complete Solaria's tortious interference and inducement of breach of contract, Plaintiff has lost profits which it would have earned through its performance under the MSA.

81.     As a direct result of Defendants' violations of the UCL, Plaintiff is entitled to restitution under the UCL.  Plaintiff is entitled for the restoration of the MSA and TLA, which were wrongfully terminated by Solaria.  Additionally, Plaintiff is entitled to injunctive relief under the UCL to enjoin (i) using the Manufacturing IP to mass produce shingled solar modules; (ii) disclosing

the Manufacturing IP to any third party; (iii) contracting with solar module producers in India, Vietnam, Cambodia, Thailand, or elsewhere who have not previously produced shingled solar modules using Solaria's shingling technology; and (iv) the further publication of the defamatory statements against Plaintiff.

## SIXTH CAUSE OF ACTION

### (Civil Conspiracy Against All Defendants)

82.     Plaintiff re-alleges and incorporates by reference each and every allegation set forth above as though fully set forth herein.

83.     All or parts of Defendants' wrongful acts were committed in concert and conspiracy amongst themselves.  Defendant Complete Solaria is the indirect parent company of Defendant Solaria as a result of the merger in November 2022.  Defendant Complete Solaria's corporate officers and directors are or were previously directors of Defendant Solaria.  For instance, Mr. Mark Swanson is currently or was the Chief Operating Officer of Solaria.  Mr. Swanson is or will become the Chief Operating Officer of Complete Solaria.  In addition. Mr. Antonio R. Alvarez is currently or was the Chief Executive Officer of Solaria and is or will become the President of Complete Solaria.   Mr. Vikas Desai is currently or was the President of Solaria and is or will become the President & General Manager, Business Units of Complete Solaria.

84.     Plaintiff believes and thereon alleges that Defendants have acted in concert to interfere with Plaintiff's contractual relations with Solaria and induce the breach of the TLA and MSA.  Complete Solaria's wrongful acts were done in concert with its subsidiary Solaria to make Defendants attractive to SPAC companies.  By breaching the contracts, Solaria has a blank slate to secure different suppliers and lower its manufacturing costs.

85.     Plaintiff believes and thereon alleges that Defendants have acted in concert to publish defamatory statements regarding Plaintiff's business.  Defendant Solaria had direct knowledge regarding Plaintiff's business and published that information to the other Defendants. Plaintiff believes and thereon alleges that the other Defendants supplied the defamatory statements to FACT. As a result, Defendants caused defamatory statements to be published by FACT in the S-4 filed with the SEC.

86.     Plaintiff believes and thereon alleges that Defendants have acted in concert to misappropriate Plaintiff's trade secrets.   In particular, Defendant Solaria had direct knowledge of Plaintiff's Manufacturing IP and was obligated to maintain its secrecy.  Defendants acted in concert to disclose the Manufacturing IP to third parties, including new manufacturers of Solaria's products. Defendants acted in concert to further the goal of consummating the planned SPAC merger, whereby Complete Solaria would go public and increase its value to $888 million.

87.     Plaintiff believes and thereon alleges that Defendants have acted in concert in perpetrating various wrongful acts and violating California's Unfair Competition Law.

88.     As a direct and proximate cause of Defendants' conspiracy, Plaintiff has suffered damages to its reputation due to Defendants' defamatory statements and has been harmed by the disclosure of its trade secrets, which has diminished their economic value.  All defendants are liable as co-conspirators for compensatory damages, injunctive relief, and restitution.

## SEVENTH CAUSE OF ACTION

### (Injunctive Relief Against All Defendants)

89.     Plaintiff  re-alleges and incorporates by reference each and every allegation set forth above as though fully set forth herein.

90.     Plaintiff alleges that, unless enjoined by order of the Court, Defendants will disclose Plaintiff's confidential information and Plaintiff's manufacturing intellectual property to third parties, including its three new manufacturers.  No adequate remedy exists at law for the injuries alleged herein, and Plaintiff will suffer great and irreparable injury if Defendants' conduct is not immediately enjoined and restrained.

91.     According to Defendants' plan for the merger with FACT which is scheduled to occur in the first half of 2023, Complete Solaria is likely to grow substantially in the future.  As Defendants rely entirely on contract manufacturers, any future growth will require the manufacture of more solar modules and more module manufacturers.  (Ex. C, p. 69).  However, the manufacturers in India, Vietnam, Cambodia, and Thailand with whom Defendants have already contracted or will contract with do not have any experience or know-how producing shingled solar modules using Solaria's shingling technology.  As such, unauthorized disclosure of Plaintiff's Manufacturing IP is

1   essential to Defendants' success in mass production of Solaria's product.

2       92.     Under the terms of the TLA, Plaintiff and Solaria agreed that "monetary damages

3   would be inadequate to compensate" for any breach of the agreement and Plaintiff is "entitled to

4   seek injunctive relief against the threatened breach of this Agreement…without the necessity of

5   proving actual damages." (Ex. B, § 6.5.) Both the MSA and the TLA under their respective

6   confidentiality provisions state that "any such violation or threatened violation may cause

7   irreparable injury and…such other party shall be entitled to seek injunctive relief against he

8   threatened breach of this Agreement…without the necessity of proving actual damages (Ex. A,

9   §12.4; Ex. B, § 6.5). Additionally, the parties acknowledged "that a breach…of any confidentiality,

10  exclusivity, intellectual property or other proprietary rights provision…may cause the non-

11  breaching Party irreparable damage…and a Party may seek the entry of an injunction…without the

12  necessity of posting a bond." (Ex. A, § 18.5)

13      93.     Therefore, Plaintiff seeks injunctive and preliminary injunctive relief enjoining (i)

14  using the Manufacturing IP to mass produce shingled solar modules; (ii) disclosing the

15  Manufacturing IP to any third party; (iii) contracting with solar module producers in India, Vietnam,

16  Cambodia, Thailand, or elsewhere who have not previously produced shingled solar modules using

17  Solaria's shingling technology; and (iv) the further publication of the defamatory statements against

18  Plaintiff.

19      94.     Plaintiff has no adequate remedy at law for the threatened injury.

20                              **PRAYER FOR RELIEF**

21      Plaintiff prays for judgment and relief as follows:

22  1.  For injunctive relief enjoining, *inter alia*, the disclosure of Plaintiff's trade secrets, the

23      execution of new manufacturing contracts with third parties, and further publication of

24      the defamatory statements for the First, Second, Fifth, Sixth, and Seventh Causes of

25      Action;

26  2.  For restitution compelling the reinstatement of the MSA and the TLA for the Third,

27      Fourth, Fifth, and Sixth Causes of Action;

28  3.  For compensatory damages exceeding $220 million according to proof at trial for the

First, Second, Third, Fourth, and Sixth Causes of Action;

4.   For exemplary and punitive damages for the First and Second Causes of Action;

5.   For attorneys' fees and legal costs allowed under applicable law; and

6.   For such other and further relief as the Court deems proper and just.

DATED:  March 16, 2023                    Respectfully Submitted,

JIPYONG LLC


By:   /s/ Jinhee Kim
      Jinhee Kim
      JIPYONG LLC


      *Attorney for Plaintiff*

COMPLAINT