1
2
3
4
UNITED STATES DISTRICT COURT

5
NORTHERN DISTRICT OF CALIFORNIA

6

7
SOLARPARK KOREA CO., LTD.,

Case No.  23-cv-01181-AMO

8
Plaintiff,

9
v.

**ORDER RE PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND DEFENDANTS' MOTION TO DISMISS AND MOTION TO STAY**

10
SOLARIA CORPORATION, et al.,

11
Defendants.

Re: Dkt. Nos. 28, 32, 38, 48

12

13
Plaintiff's Motion for Preliminary Injunction (ECF 28) and Defendants' Partial Motion to

14
Dismiss and Motion to Stay (ECF 32) were heard by this Court on July 11, 2023.  Having read the

15
papers filed by the parties and carefully considered their arguments and the relevant legal

16
authority, and good cause appearing, the Court hereby rules as follows.

17
**BACKGROUND**

18
Plaintiff SolarPark Korea Co., Ltd. ("SolarPark") is a solar module manufacturer based in

19
Korea.  Compl. (ECF 1) ¶ 12.  Defendant The Solaria Corporation ("Solaria") is an industry leader

20
in design, development, and manufacture of photovoltaic products, including high-efficiency solar

21
modules.  Compl. ¶ 13.  Of particular relevance to the instant dispute, Solaria developed and owns

22
intellectual property relating to "shingling" technology for solar modules, whereby solar cells are

23
cut and overlapped with each other to form shingles.  Compl. ¶ 13.  Defendant Complete Solaria,

24
Inc. ("Complete Solaria") was formed in November 2022 through the merger of Complete Solar

25
Holding Corporation and Solaria.  Compl. ¶ 32.  Following the merger, Solaria is now a wholly-

26
owned subsidiary of Complete Solaria.  Compl. ¶ 33.

27
**A.      Factual Background**

28
Solaria and SolarPark worked together starting in 2016 pursuant to an original agreement

United States District Court
Northern District of California

under which Solaria supplied solar cells to SolarPark for manufacturing shingled solar modules. Compl. ¶ 15.  In the course of their relationship, SolarPark produced Solaria's product and developed the unique know-how to mass produce shingled solar modules (the "Manufacturing IP").  Compl. ¶ 16.  The parties entered into several agreements to support the manufacturing and supply of solar modules.

The parties executed the Technology License Agreement (the "TLA") on October 6, 2018. Compl. ¶ 17.  The TLA included a cross license for each party's respective intellectual property. Compl. ¶ 17.  The TLA contains an arbitration agreement which states:

> If the Parties do not reach settlement within a period of 60 days, any dispute, claim or controversy arising out of this Agreement shall be settled by arbitration in Singapore administered in English by the Singapore International Arbitration Centre in accordance with its Arbitration Rules existing at the time of the arbitration, and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.

Compl., Ex. B, § 10.2 (ECF 1-2 at 12).

Solaria proposed to increase production of its products in 2019.  Compl. ¶ 18.  To that end, the parties entered into the Agreement for Supply dated June 20, 2019 ("the Supply Agreement") and the Solar Module Sales Agreement dated August 4, 2019 (the "MSA").  Compl. ¶¶ 20-21. The MSA superseded the parties' 2016 agreement, but not the TLA.  Compl. ¶ 21.  Like the TLA, the MSA contains an arbitration agreement, which states in part:

> In the event of any controversy or claim arising out of or relating to this Agreement, the parties hereto shall consult and negotiate with each other and, recognizing their mutual interests, attempt to reach a solution satisfactory to both parties. If settlement is not reached within sixty (60) days, any unresolved controversy or claim arising out of or relating to the Agreement, or the breach thereof, shall be settled by binding arbitration administered by the Singapore International Arbitration Centre (SIAC) under their Arbitration Rules and judgment on the award rendered by the arbitrator in any court having jurisdiction thereof.

Compl., Ex. A, § 18.4 (ECF 1-1 at 19).  Immediately following this language, the MSA carves out an exception to the arbitration agreement for claims for equitable relief involving breaches of the confidentiality and intellectual property provisions.  *Id.*  The MSA specifically vests exclusive jurisdiction over these equitable claims in state and federal courts in Alameda County.  *Id.*

2

1   SolarPark experienced financial difficulties and shut down its manufacturing facilities on

2   December 31, 2021.  Compl. ¶ 27.  Shortly thereafter, Solaria sent a letter terminating the MSA on

3   January 19, 2022, and later terminated the TLA on June 28, 2022.  Compl. ¶¶ 28, 30.

4   In October 2022, Freedom Acquisition I Corporation ("FACT"), a special purpose

5   acquisition company, announced its planned merger with Solaria and Complete Solar Holding

6   Corporation.  Compl. ¶ 32.  In November 2022, Solaria merged with Complete Solar Holding

7   Corporation to form Complete Solaria.  Compl. ¶ 33.

8   As part of the merger, FACT filed a Form S-4 Registration Statement with the U.S.

9   Securities and Exchange Commission on February 9, 2023 (the "S-4").  Compl. ¶ 36.  SolarPark

10   learned from the S-4 that Defendants had obtained new manufacturers to produce their products.

11   In particular, the S-4 stated that "Complete Solaria's solar modules are generally manufactured by

12   third-party select manufacturers.  As of December 31, 2022, the primary solar module suppliers

13   were Waaree Energies Ltd., Goldi Solar Pvt Ltd., and GCL System Integration Technology Co.

14   Ltd."  Compl., Ex. C-3 at 250 (ECF 1-5 at 65).  The S-4 also contained several statements

15   concerning SolarPark, claiming that it "permanently ceased production in December 2021" and

16   that "subsequent to December 31, 2021 Solar Park filed for bankruptcy."  Compl. ¶¶ 36-39.

**B.      The Arbitration**

18   In June 2022, Solaria filed a notice of arbitration against SolarPark with the Singapore

19   International Arbitration Centre ("SIAC"), Case No., ARB/160/22/WXZ (the "Arbitration").

20   *Id.* ¶¶ 2, 38. Complete Solaria is not a party to the Arbitration.  *Id.* ¶ 2.  SolarPark's Statement of

21   Defence and Counterclaims alleged, among other things, that Solaria breached the MSA.  *Id.*

**C.      This Action and Instant Motions**

23   SolarPark's complaint asserts seven causes of action against Solaria, Complete Solaria, and

24   Does 1 through 10.  Through its Motion for Preliminary Injunction, SolarPark seeks to enjoin

25   Solaria and Complete Solaria from (a) using its trade secrets, (b) producing certain of Solaria's

26   brands of shingled solar modules, and (c) soliciting other manufacturers to produce the shingled

27   solar modules.  ECF 28.  Additionally, SolarPark seeks an injunction restraining both Solaria and

28   Complete Solaria from making further libelous or defamatory statements concerning SolarPark.

United States District Court
Northern District of California

3

1  SolarPark also requests multiple forms of expedited discovery to aid its enforcement of a

2  preliminary injunction.

3          After SolarPark filed the Motion for Preliminary Injunction, Defendants Solaria and

4  Complete Solaria moved to dismiss or stay several of the causes of action.  Solaria styles its

5  motion as a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6).  Regardless of

6  form, in substance it is a motion to compel arbitration.  Solaria asserts that (1) the parties have

7  entered into valid arbitration agreements in the MSA and TLA; (2) the parties are already

8  arbitrating related claims; and (3) four counts fall completely or partially within the scope of the

9  arbitration agreements.  ECF 32 at 13.  Solaria seeks to stay the remaining claims until the SIAC

10  Arbitration is complete.  *Id.*

11          Though courts "may not 'rule on the potential merits of [an] underlying' claim that is

12  assigned by contract to an arbitrator," *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct.

13  524, 529 (2019) (quoting *AT&T Technologies, Inc. v. Communications Workers,* 475 U.S. 643,

14  649-50 (1986)), the MSA provides an exception for certain claims of equitable relief such as the

15  injunctions sought here to be considered by the Court.  Compl., Ex. A, § 18.5.  Solaria does not

16  argue that SolarPark's claims for trade secret misappropriation and defamation are arbitrable.

17  Given the contractual exception in the MSA for equitable relief, and that there is no dispute as to

18  the arbitrability of these claims, the issues for consideration in the motion for preliminary

19  injunction are properly before this Court.  Additionally, whether the Court grants interim relief

20  factors into the Court's assessment of Solaria's requested stay.  Accordingly, the Court begins by

21  analyzing SolarPark's motion for preliminary injunction.

22                          **PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

23  **A.      Legal Standard for Preliminary Injunction**

24          A preliminary injunction is an "extraordinary remedy that may only be awarded upon a

25  clear showing that the plaintiff is entitled to such relief."  *See Winter v. Natural Res. Def. Council,*

26  *Inc.*, 555 U.S. 7, 22 (2008).  The party seeking a preliminary injunction must establish: (1) a

27  likelihood of success on the merits; (2) a likelihood of irreparable harm absent preliminary relief;

28  (3) that the balance of equities tips in the plaintiff's favor; and (4) that an injunction is in the

United States District Court
Northern District of California

1    public interest.  *See id.* at 20.  A court must find that "a certain threshold showing" is made on

2    each of the four required elements.  *Leiva-Perez v. Holder*, 640 F.3d 962, 966 (9th Cir. 2011).

3    Under the Ninth Circuit's sliding scale approach, a court may issue a preliminary injunction if

4    there are "serious questions going to the merits" if "a hardship balance [also] tips sharply towards

5    the [movant]," and "so long as the [movant] also shows that there is a likelihood of irreparable

6    injury and that the injunction is in the public interest."  *All. for the Wild Rockies v. Cottrell*, 632

7    F.3d 1127, 1135 (9th Cir. 2011).

8    **B.    Trade Secret Preliminary Injunction**

9        The Court takes up the *Winter* factors in turn.

10       **1.    Likelihood of Success on the Merits**

11       To succeed in a claim for trade secret misappropriation under the Title 18 U.S.C.

12   section 1836 and California Civil Code section 3426, Solar Park must ultimately establish that: (1)

13   it owned a trade secret; (2) Defendants misappropriated the trade secret; and (3) their actions

14   damaged SolarPark.  *See Alta Devices, Inc. v. LG Elecs., Inc.*, 343 F. Supp. 3d 868, 877 (N.D. Cal.

15   2018).  These Court examines these elements in turn to assess whether SolarPark is likely to

16   succeed on its claims of trade secret misappropriation.

17       **a.    Whether SolarPark Owned a Trade Secret**

18       Title 18 U.S.C. § 1839(3) defines a trade secret to mean:

19           "all forms and types of financial, business, scientific, technical,
             economic, or engineering information, including patterns, plans,
20           compilations, program devices, formulas, designs, prototypes,
             methods, techniques, processes, procedures, programs, or codes,
21           whether tangible or intangible, and whether or how stored,
             compiled, or memorialized physically, electronically, graphically,
22           photographically, or in writing if--

23           (A) the owner thereof has taken reasonable measures to keep such
             information secret; and
24
             (B) the information derives independent economic value, actual or
25           potential, from not being generally known to, and not being readily
             ascertainable through proper means by, another person who can
26           obtain economic value from the disclosure or use of the
             information."
27

28   18 U.S.C. § 1839(3)(A)-(B).

5

United States District Court
Northern District of California

California Civil Code § 3426.1(d) similarly defines a trade secret to mean "information . . . that (1) [d]erives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and (2) [i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Cal. Civ. Code § 3426.1(d)(1)-(2).  California courts have explained that "[i]nformation has a broad meaning" and "[t]he definition of trade secret is . . . unlimited as to any particular class or kind of matter and may be contrasted with matter eligible for patent or copyright protection, which must fall into statutorily defined categories.  [Citation.]  A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." *Altavion, Inc. v. Konica Minolta Sys. Lab., Inc.*, 226 Cal. App. 4th 26, 53 (2014) (internal citations and quotation marks omitted).

### i.        Description of the Purportedly Misappropriated Information

A plaintiff is only required to "describe the subject matter of the trade secret with sufficient particularity to separate it from matters of general knowledge in the trade or of special persons who are skilled in the trade, and to permit the defendant to ascertain at least the boundaries within which the secret lies." *Alta Devices, Inc.*, 343 F. Supp. 3d at 881 (citations omitted).  The *Alta* court, considering LG's contention that Alta failed to allege its trade secrets with sufficient particularity, held that Alta had described them with sufficient particularity, in part because Alta's claims were based on confidential information exchanged under the non-disclosure agreement. LG could "hardly claim that it was unable to determine what trade secrets" Alta gave to it under the agreement.  *Id.* at 881 (citations omitted).

Other courts have determined that "[t]echnical 'know-how' is the quintessential trade secret," and it is accordingly often granted trade secret protection.  *Whyte v. Schlage Lock Co.*, 101 Cal. App. 4th 1443, 1456 (2002).  Where a party's production process improves on the standard process, courts have found the trade secret identification to be sufficient. *Navigation Holdings, LLC v. Molavi*, 445 F. Supp. 3d 69, 78 (N.D. Cal. 2020) (finding the designation of "specialized process for anodizing unfinished alloy tubes, before machining, for the aerospace industry" to be

sufficient).

Here, SolarPark claims to own trade secrets for mass-producing shingled solar modules. Defendants contest that SolarPark fails to identify any trade secrets related to shingled solar modules, arguing that the only trade secrets identified are Solaria's own patents for the specialized technology. *See* ECF 35 at 16-17. That argument misses the point, however. SolarPark acknowledges Solaria's specialized knowledge in shingled solar modules, and it advances that SolarPark's trade secrets lie in the *mass-production* of those shingled solar modules, which reach beyond Solaria's patents. As clarified in SolarPark's Identification of Trade Secrets, the trade secrets are comprised of SolarPark's "know-how" related to "mass-producing low-cost, high-quality shingled solar modules." Park Decl, Ex. D (ECF 28-5 at 3). Eleven of the twelve categories of purported trade secrets are characterized as "Know-How," which reflect a specialized process developed by SolarPark to improve on Solaria's shingling patents. *Id.* Such identified improvements to the manufacturing process, allowing for mass-production with reportedly higher levels of quality, resemble the production process improvements considered to constitute a trade secret in *Molavi*. *See* 445 F. Supp. 3d at 78.

Defendants contend that SolarPark's description of its know-how is not sufficiently specific to describe trade secrets, but SolarPark's claims of trade secrets arise from the parties' prior manufacturing relationship. SolarPark and Solaria entered into several agreements with each other in which they both agreed to maintain the confidentiality of the other sides' information. Under the MSA, SolarPark owned the "SPK Manufacturing IP," which pertained to its general manufacturing expertise, equipment, and processes, excluding the Solaria Licensed IP. Park Decl., Ex. C at § 2.14 (ECF 28-4 at 4). Under the same agreement, the Solaria Licensed IP specifically refers to Solaria's rights to the Solaria Technology as something distinct from the Manufacturing IP. *Id.* at §§ 2.12-13 (ECF 28-4 at 3-4). The parties' relationship, as memorialized through multiple confidentiality agreements, evidences that Solaria possesses sufficient information about the alleged confidential and trade-secret information. As in *Alta Devices*, the contracting Defendant here, Solaria, can "hardly claim" that it is unable to determine the scope of SolarPark's confidential information. *See Alta Devices, Inc.*, 343 F. Supp. 3d at 881. It is

7

United States District Court
Northern District of California

1    disingenuous for Solaria to now assert that SolarPark has no identifiable, protectable trade secrets

2    of its own after the companies worked together for years to develop such trade secrets and agreed

3    to keep them confidential.

4         Further, SolarPark's know-how is not generally known in the industry. The vast majority

5    of solar manufacturers have no experience manufacturing shingled solar modules. Park Decl.,

6    ¶¶ 7, 38 (ECF 28-1 at 2-3, 9-10). SolarPark reports that it can produce high-quality, low-cost

7    modules because it spent at least five years developing the trade secrets and constantly retooling

8    the processes to account for changes to equipment and components. Park Decl., ¶¶ 16, 19, 28, 38

9    (ECF 28-1 at 4-5, 7-8, 9-10). SolarPark developed, refined, and perfected the manufacturing

10   process and was able to minimize breakage of solar cells and reduce the use of an electrically

11   conductive adhesive, which enabled cost savings and a consistent output of reliable and high-

12   quality solar modules. Park Decl., ¶¶ 16, 23, 26 (ECF 28-1 at 4, 6-7). These types of

13   manufacturing know-how constitute a trade secret. *See Whyte*, 101 Cal. App. 4th at 1456.

14         In sum, despite Solaria's attacks on SolarPark's designations, SolarPark sufficiently

15   identifies its purported trade secrets, the allegedly misappropriated information.

16                   **ii.**       **Independent Economic Value**

17         "To have independent economic value, a trade secret must be sufficiently valuable and

18   secret to afford an actual or potential economic advantage over others." *Cisco Sys., Inc. v. Chung*,

19   462 F. Supp. 3d 1024, 1052 (N.D. Cal. 2020) (quoting *Calendar Research LLC v. StubHub, Inc.*,

20   2017 WL 10378336, at *3 (C.D. Cal. Aug. 16, 2017)). "A plaintiff may show independent

21   economic value 'by circumstantial evidence of the resources invested in producing the

22   information, the precautions taken to protect its secrecy, and the willingness of others to pay for its

23   access.'" *Cisco Sys., Inc.*, 462 F. Supp. 3d at 1052 (quoting *Calendar Rsch. LLC*, 2017 WL

24   10378336, at *3). "The standard to show that trade secrets derive [independent] economic value is

25   not a high standard." *Id.* (quoting *Calendar Rsch. LLC*, 2017 WL 10378336, at *4).

26         Solaria argues on several grounds that SolarPark has not derived independent economic

27   value from its claimed manufacturing trade secrets. None of its arguments are compelling. While

28   Solaria takes issue with SolarPark's inconsistent valuation of the investment SolarPark has made

to develop the trade secrets, Solaria does not show how such inconsistency demonstrates a lack of economic value for the trade secrets. Similarly, Solaria seeks to diminish the economic value of SolarPark's trade secrets by quibbling with the number of years SolarPark invested into developing them. ECF 35 at 21 (emphasizing that the quality recognition awards Solaria won for the SolarPark-manufactured products were issued after only two years of the companies' engagement, and not the five years of their relationship to which SolarPark points). None of this demonstrates that SolarPark's trade secrets lack economic value.

Contrary to Solaria's oblique attacks, SolarPark's trade secrets have economic value, particularly when viewed in light of the parties' ongoing business relationship. SolarPark's trade secrets enabled Solaria to mass-produce its shingled solar modules and ensured that the finished product was high quality while simultaneously lowering the costs. Park Decl., ¶¶ 12, 25, 28 (ECF 28-1 at 4, 7-8). Solaria does not dispute this. Their failure to do so is sufficient to show that SolarPark's trade secrets have independent economic value. *See Calendar Rsch. LLC*, 2017 WL 10378336, at *4 (finding that trade secrets have economic value when it was alleged that they "enable the creation of economically successful applications for use on mobile phones and the Web. Such creation and development would be less profitable without the expedited and simplified development processes inherent in these trade secrets.").

### iii.    Efforts to Maintain Secrecy

Solaria does not contest that SolarPark took "reasonable efforts" to maintain the secrecy of its purported trade secrets; rather, Solaria argues that such secrecy is irrelevant because the information is either generally known in the industry or it is owned by Solaria. Said another way, Solaria avers that SolarPark does not have any manufacturing IP. However, Solaria's assertion is belied by the content of the parties' written agreements.

From the beginning, SolarPark and Solaria operated under a confidentiality agreement and Solaria understood that SolarPark's manufacturing intellectual property was SolarPark's alone and distinct from Solaria's shingling technology. Park Decl., ¶ 30 (ECF 28-1 at 8). Their earliest contract provided that SolarPark owned "all existing Intellectual Property of Manufacturer" and "all Intellectual Property arising in the course of Manufacturer's performance of his Agreement

1   . . . other than Intellectual Property unique to Products and or necessary for their manufacture."

2   Park Decl., Ex. A at § 10.3 (ECF 28-2 at 12).

3   SolarPark and Solaria entered into the TLA on October 6, 2018, which primarily

4   concerned the grant of a license for SolarPark to manufacture and distribute LCHD solar modules.

5   Park Decl., Ex. E (ECF 28-6).  Like previous agreements, there were confidentiality provisions.

6   In particular, confidential information was defined to include "know-how and/or trade secrets of

7   the Discloser."  Park Decl., Ex. E § 6.1 (ECF 28-6 at 9).

8   The Supply Agreement contained confidentiality and intellectual property provisions

9   similar to those of the 2016 Agreement.  *See* Park Decl., Ex. A at §§ 10.3, 18.1 (ECF 28-2 at 12);

10   Ex. B at §§ 10.3, 17.1 (ECF 28-3 at 9-10, 15).  Under the Supply Agreement, "All existing

11   Intellectual Property of Supplier will continue to be owned by Supplier and all Intellectual

12   Property arising in the course of Supplier's performance of this Agreement will be owned by

13   Supplier other than Intellectual Property solely and uniquely related to Products" which was

14   owned by Solaria.  *Id.*, Ex. B at § 10.3 (ECF 28-3 at 9-10).

15   The MSA also contained confidentiality provisions governing "any information disclosed

16   by either party to the other party . . . which is designated as 'Confidential,' 'Proprietary' or some

17   similar designation."  Park Decl., Ex. C at § 12.1 (ECF 28-4 at 14).  Under the MSA, it was made

18   clear that SolarPark owned all "SPK Manufacturing IP," which was "all intellectual property

19   rights of any kind or nature arising the laws of any jurisdiction anywhere in the world, including

20   . . . know-how . . . methods, processes, technical data, specifications, research and development,

21   and any other proprietary rights owned or controlled by [SolarPark] which pertain to [SolarPark's]

22   general manufacturing expertise, equipment, and processes."  *Id.* at §§ 2.14, 11.4 (ECF 28-4 at 4,

23   14).

24   Moreover, SolarPark has required that its employees agree not to disclose its

25   manufacturing intellectual property as part of their employment contracts.  Park Decl., ¶ 33 (ECF

26   27-5 at 8).  This, combined with the several confidentiality provisions noted above, demonstrates

27   that SolarPark took "reasonable efforts" to maintain the secrecy of its purported trade secrets.

28   In sum, SolarPark demonstrates that it owns trade secrets in its mass-manufacturing know-

1    how, which has independent economic value and which the company has taken reasonable efforts

2    to keep secret.  The next inquiry is whether Solaria misappropriated the mass-manufacturing trade

3    secrets.

4                    **b.        Whether Solaria Misappropriated a Trade Secret**

5            Under the trade secret laws, "misappropriation" can take two broad forms.  First,

6    misappropriation can be "acquisition of a trade secret of another by a person who knows or has

7    reason to know that the trade secret was acquired by improper means."  18 U.S.C. § 1839(5)(A);

8    *accord* Cal. Civ. Code § 3426.1(b)(1).  Second, misappropriation can be

9               disclosure or use of a trade secret of another without express or
                implied consent by a person who –
10              (i) used improper means to acquire knowledge of the trade secret;
                (ii) at the time of disclosure or use, knew or had reason to know that
11              the knowledge of the trade secret was –
12                     (I) derived from or through a person who had used improper
                means to acquire the trade secret;
13                     (II) acquired under circumstances giving rise to a duty to
                maintain the secrecy of the trade secret or limit the use of the trade
                secret; or
14                     (III) derived from or through a person who owed a duty to
                the person seeking relief to maintain the secrecy of the trade secret
15              or limit the use of the trade secret; or
                (iii) before a material change of the position of the person, knew or
16              had reason to know that –
                       (I) the trade secret was a trade secret; and
17                     (II) knowledge of the trade secret had been acquired by
                accident or mistake.
18

19   18 U.S.C. § 1839(5)(B); *accord* Cal. Civ. Code § 3426.1(b)(2).

20           Courts generally differentiate between direct and indirect misappropriation.  Indirect trade

21   secret misappropriation involves a showing that a defendant "knew or had reason to know before

22   the use or disclosure that the information was a trade secret and knew or had reason to know that

23   the disclosing party had acquired it through improper means or was breaching a duty of

24   confidentiality by disclosing it."  *Molavi*, 445 F. Supp. 3d at 79.  "In analyzing misappropriation,

25   the inquiry focuses on all of the threads of its allegations woven together – the 'whole gestalt' . . .

26   of the complaint or evidence – not each in isolation."  *Wisk Aero LLC v. Archer Aviation Inc.*, No.

27   3:21-CV-02450-WHO, 2021 WL 8820180, at *11 (N.D. Cal. Aug. 24, 2021) (citations omitted).

28           Under the CUTSA, "actual or threatened misappropriation may be enjoined."  Cal. Civ.

United States District Court
Northern District of California

1   Code. § 3426.2(a); *see also Cent. Valley Gen. Hosp. v. Smith*, 162 Cal. App. 4th 501, 524 (2008).

2   Threatened misappropriation involves either "(1) trade secrets [that] (2) remain in the possession

3   of a defendant (3) who actually has misused or disclosed some of those trade secrets in the past" or

4   "(1) trade secrets [that] (2) are held by a defendant (3) who intends to improperly use or disclose

5   some of those trade secrets." *Cent. Valley Gen. Hosp.*, 162 Cal. App. 4th at 527-28 (internal

6   citations omitted).

7        SolarPark theorizes that Solaria has engaged in indirect misappropriation by breaching its

8   duty of confidentiality through the completed or anticipated disclosure of SolarPark's trade secrets

9   to other solar module manufacturers.  SolarPark points to public disclosures stating that Solaria

10  has found cheaper manufacturers located in India and Vietnam as well as Complete Solaria's

11  future sales projections.  Park Decl. ¶¶ 38-39 (ECF 28-6 at 9-10).  SolarPark anticipates that

12  Solaria's use of these other manufacturers necessarily means that Solaria has or will disclose

13  SolarPark's purported trade secrets because these manufacturers would not otherwise be capable

14  of such mass production.  *Id.*  Solaria's disclosure of SolarPark's manufacturing trade secrets to

15  third parties violates Solaria's duty to maintain the trade secrets under each of the contracts

16  between the two companies.  Park Decl., Ex. C § 12, Ex. E § 6 (ECF 28-4 at 14; ECF 28-6 at 9).

17  The disclosure of SolarPark's mass-production manufacturing trade secrets would breach Solaria's

18  duty of confidentiality and accordingly constitute misappropriation.  *See* 18 U.S.C.

19  § 1839(5)(B)(ii)(III).

20        However, Solaria challenges SolarPark's theory that other manufacturers are incapable of

21  manufacturing the shingled solar modules without SolarPark's know-how.  Solaria argues that at

22  least one other manufacturer has been manufacturing shingled solar modules for Solaria using a

23  process used before that manufacturer entered into a contract with Solaria.  *See* Opp. Br. at 18-19

24  (ECF 35 at 23-24); Desai Decl. ¶ 5 (ECF 34-5 at 3-4).  Solaria's argument, however, continues to

25  ignore the substance of SolarPark's claims.  SolarPark does not claim that other entities are

26  incapable of manufacturing the shingled solar modules; instead, SolarPark claims that it has

27  specialized knowledge centered on the mass-production of the shingled solar modules, which

28  Solaria is prohibited from misappropriating.  Solaria's framing therefore does not contradict

United States District Court
Northern District of California

12

SolarPark's contentions regarding the danger of trade secret disclosure.  Further, Solaria's continued insistence that SolarPark's manufacturing processes do not amount to trade secrets suggests that Solaria does not consider the processes sufficiently confidential to withhold from its other manufacturing partners.  This consideration adds weight to SolarPark's concern that such information has been or will be disclosed to third parties in violation of its confidentiality agreements with Solaria.

Viewing the threads of SolarPark's allegations together, the evidence demonstrates that Solaria has or could share SolarPark's manufacturing trade secrets with other companies because Solaria remains in possession of SolarPark's manufacturing knowhow and fails to acknowledge that those mass-production trade secrets belong to SolarPark.  The Court finds that SolarPark is likely to succeed in its claim that Solaria misappropriated or threatens to misappropriate SolarPark's trade secrets.

### 2.    Irreparable Harm

The Court next examines whether SolarPark has/can show it has been or will be irreparably harmed.  A plaintiff seeking a preliminary injunction must demonstrate "that irreparable injury is likely in the absence of an injunction."  *Winter*, 555 U.S. at 21.  "A plaintiff must do more than merely allege imminent harm sufficient to establish standing; a plaintiff must demonstrate immediate threatened injury as a prerequisite to preliminary injunctive relief."  *Id.* "Irreparable harm is traditionally defined as harm for which there is no adequate legal remedy, such as an award of damages."  *Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014).  However, in trade secret cases, "[i]t is well established that the loss of market position and the disclosure of trade secrets can constitute irreparable harm."  *WeRide Corp. v. Kun Huang*, 379 F. Supp. 3d 834, 853-54 (N.D. Cal. 2019).  "In addition, '[c]ourts concur that a defendant's ability to gain a competitive advantage through the use of confidential information to develop a competing product is sufficient to constitute irreparable harm.'"  *E. W. Bank v. Shanker*, No. 20-CV-07364-WHO, 2021 WL 3112452, at *12 (N.D. Cal. July 22, 2021) (citation omitted).

Here, there is a likelihood of irreparable harm because absent a preliminary injunction, SolarPark will likely suffer a loss of market position, loss of current and prospective customers,

and increased risk of disclosure of its mass-production trade secrets to third parties.  Currently,
there are only a handful of manufacturers that can mass-produce shingled solar modules, which
accounts for only 3% of the global market for solar panels.  Park Decl. ¶ 6 (ECF 28-1 at 2).
"Disclosure of SolarPark's Trade Secrets would forever deprive SolarPark of its competitive edge
and current and future business opportunities."  Park Decl. ¶ 38 (ECF 28-1 at 9-10).  Once
SolarPark's trade secrets are disclosed to companies with no experience with the shingling
technology, SolarPark will lose its competitive edge.  Monetary damages would not suffice
because in such small premium market, maintaining the market share is critical to securing future
business.

Solaria contends that the risk of irreparable harm is weakened by SolarPark's delay in
seeking injunctive relief – Shinsung, a competitor, began producing Solaria's PowerXT® products
in 2019, and SolarPark has not acted to protect its purported trade secrets until now.  However,
Solaria fails to provide any factual support for this assertion.  Moreover, SolarPark explains that it
delayed legal recourse, instead negotiating with Solaria to protect its trade secrets as Shinsung
began producing some Solaria products.  *See* Park Reply Decl. ¶¶ 22-28 (ECF 40-5 at 6-7).
SolarPark pursued this action upon discovering that misappropriation was likely to be ongoing, a
distinct circumstance from the intermittent instances of Solaria's engagement with other
producers.  Although delay is a factor that weighs against a likelihood of irreparable harm, the
delay here does not outweigh the other evidence that, absent a preliminary injunction, SolarPark
will be irreparably harmed.

### 3.    Balance of the Equities and Public Interest

SolarPark argues that Solaria will suffer no cognizable harm from the proposed trade secret
preliminary injunctions because it would simply require Solaria to comply with its existing
contractual obligations.  The parties previously agreed that breaches of the confidentiality and
intellectual property provisions could cause the other irreparable harm and agreed that the non-
breaching party could "institute an action to enjoin . . . any and all acts in violation of those
provisions, which remedies will be cumulative and not exclusive . . . without the necessity of
posting a bond."  Park Decl., Ex. C at § 18.5 (ECF 28-4 at 19).  SolarPark reasons that Solaria

United States District Court
Northern District of California

1  cannot be harmed by being required to comply with the law and the contracts.  *Henry Schein, Inc.*

2  *v. Cook*, 191 F. Supp. 3d 1072, 1077 (N.D. Cal. 2016) (finding balance of hardships tips in favor

3  of plaintiff seeking an injunction when it would merely require defendant to comply with

4  provisions of an existing agreement).

5     Solaria argues conversely that the equities tip in its favor because the injunctive relief

6  SolarPark seeks would alter the status quo by requiring the re-institution of the relationship

7  between Solaria and SolarPark, which has already been terminated.  Further, Solaria would face an

8  "anticompetitive punishment" if forced to discontinue their existing manufacturing relationships

9  and soliciting all others except SolarPark.  *See Indep. Techs., LLC v. Otodata Wireless Network,*

10  *Inc.*, 836 F. App'x 531, 534 (9th Cir. 2020) (finding an injunction that prevented soliciting

11  companies was overbroad and should be tailored to simply avoid the use of trade secrets in those

12  solicitations).

13     Solaria's argument misses the mark.  Regardless of Solaria's termination of the operational

14  relationship between the companies, the confidentiality provisions of their agreement survive.  For

15  example, the TLA expressly provides that the confidentiality provision survives termination of the

16  agreement.  Compl., Ex. B §§ 5.4, 6 (ECF 1-2 at 8-10).  Therefore, the confidentiality provision

17  remains in effect and the Court agrees with SolarPark that an injunction prohibiting Solaria from

18  using SolarPark's trade secrets merely requires Solaria to comply with its existing obligations. As

19  other courts in this District have concluded, "the public interest is served when defendant is asked

20  to do no more than abide by trade laws and the obligations of contractual agreements" entered by

21  the parties.  *Henry Schein, Inc.*, 191 F. Supp. 3d at 1078.  The public interest weighs in favor of a

22  narrowly tailored injunction to prohibit the use of SolarPark's trade secrets.

23     **4.     Entitlement to Preliminary Injunctive Relief and Scope of Injunction**

24     Based on this record, the Court concludes that SolarPark is entitled to preliminary

25  injunctive relief.  As discussed above, the Court finds that SolarPark has satisfied all the *Winter*

26  factors with respect to its claim for trade secret misappropriation.  The scope of the injunction the

27  Court should issue remains.

28     "'District courts have broad latitude in fashioning equitable relief when necessary to

remedy an established wrong.'" *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1024 (9th Cir. 2016) (quoting *Earth Island Inst. v. Carlton*, 626 F.3d 462, 475 (9th Cir. 2010)).  "The 'purpose of a preliminary injunction is to preserve the status quo ante litem pending a determination of the action on the merits.'" *Id.* (quoting *Sierra Forest Legacy v. Rey*, 577 F.3d 1015, 1023 (9th Cir. 2009)).  "The status quo ante litem refers not simply to any situation before the filing of a lawsuit, . . . [which c]ould lead to absurd situations, in which plaintiffs could never bring suit once [unlawful] conduct had begun," but "instead to 'the last uncontested status which proceeded the pending controversy.'" *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1210 (9th Cir. 2000) (quoting *Tanner Motor Livery, Ltd. v. Avis, Inc.*, 316 F.2d 804, 809 (9th Cir. 1963)); *accord Boardman*, 822 F.3d at 1024 (quoting *GoTo.com*, 202 F.3d at 1210).  Equitable relief may "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 779 (9th Cir. 2018) (quoting *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994)).

Here, SolarPark seeks to enjoin a wide range of conduct related to its mass-production trade secrets, including injunctions on Solaria's use of the trade secrets, production of its own products, and solicitation of additional manufacturers.  Some of the relief sought, however, would reach beyond the status quo of simply protecting SolarPark's trade secrets, and thus the Court must issue a narrower injunction.  Related to the use of the trade secrets, SolarPark asks to restrain Solaria from the following:

> Any and all use, disclosure, providing third parties access to, transferring, copying, duplication, reproduction, publication, distribution, broadcasting or marketing of any version of SolarPark's trade secrets as defined in SolarPark's Identification of Trade Secrets pursuant to California Code of Civil Procedure Section 2019.210.

ECF 28-7 at 2.  This portion of the requested relief appears reasonable and necessary to protect the company's trade secrets.  Further, it maintains the confidential status of SolarPark's mass-production trade secrets.  The Court, accordingly, orders such a restriction.

SolarPark's other two requests, however, reach beyond the protection of its trade secrets. The proposed production and solicitation injunctions read as follows:

> Any and all manufacture, assembly, production, distribution, offering

16

for distribution, circulating, sale, offering for sale, advertising, marketing, or importing PowerXT® or any other brand of shingled solar modules, except for those manufactured by or through SolarPark. . . . [and]

Any and all solicitation, negotiation, or execution of an agreement with solar module manufacturers to manufacture, produce, or supply shingled solar modules using the "shingling" technology.

ECF 28-7 at 2.  Both of these proposals would prohibit Solaria from utilizing its own patents for the shingled solar modules, and they would create an exclusive manufacturing relationship between SolarPark and Solaria where one did not previously exist.  The Court cannot require such restrictions as they would create a circumstance out of line with the status quo.

Overall, the Court concludes that all four *Winter* factors have been met and **GRANTS** the requested preliminary injunction as amended.  Solaria will be enjoined from using SolarPark's trade secrets related to the mass-production of shingled solar panels.  Given the merger and creation of Complete Solaria, it is necessary to include that entity within the injunction as well. No bond is necessary because the parties agreed that either party could seek injunctive relief without a bond.  Park Decl., Ex. C at § 18.5 (ECF 28-4 at 19).

C.     **Defamation Preliminary Injunction**

SolarPark additionally seeks an injunction to restrain Solaria and Complete Solaria from making more allegedly defamatory statements concerning SolarPark like the statements about SolarPark's financial condition included in FACT's Form S-4.  *See* ECF 28 at 27-28.  A claim for defamation under California law involves "a publication" that is "false," "defamatory," "unprivileged," and that "has a natural tendency to injure or that causes special damage." *Taus v. Loftus*, 40 Cal. 4th 683, 720 (2007) (citation omitted).  "Defamatory language not libelous on its face is not actionable unless the plaintiff alleges and proves that he has suffered special damage as a proximate result thereof."  Cal. Civ. Code § 45a.  "With very few exceptions, the "remedy for defamation is a damages action after publication, not a preliminary injunction." *Living Vehicle, Inc. v. Kelley*, No. 2:22-CV-06226-RGK-AS, 2023 WL 2347442, at *10 (C.D. Cal. Jan. 20, 2023) (citation and quotation marks omitted).

A prior restraint is a "judicial order[ ] forbidding certain communications," and may refer either to injunctions that restrict future speech or require takedowns of currently-published speech.

1    *Alexander v. United States*, 509 U.S. 544, 550 (1993); *see also Garcia v. Google, Inc.*, 786 F.3d

2    733, 746-47 (9th Cir. 2015) ("[A] takedown order . . . is a classic prior restraint of speech.").  Prior

3    restraints "are the most serious and the least tolerable infringement on First Amendment rights."

4    *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976).  The presumption against prior restraints is

5    heavy, and a court may only impose one if: "(1) the activity restrained poses either a clear and

6    present danger or a serious and imminent threat to a protected competing interest, (2) the

7    [injunction] is narrowly drawn, and (3) less restrictive alternatives are not available."  *Levine v.*

8    *U.S. Dist. Ct.*, 764 F.2d 590, 595 (9th Cir. 1985).  It is extremely difficult for a plaintiff to

9    overcome the presumption on a motion for preliminary injunction, because "[w]here there has

10   been no trial and no determination on the merits that there is actionable defamation . . . the court

11   cannot prohibit a party from making statements" that are only arguably defamatory.  *Elec.*

12   *Frontier Found. v. Global Equity Mgmt. (SA) Pty. Ltd.*, 209 F. Supp. 3d 923, 943 n.10 (N.D. Cal.

13   2017) (citing *Evans v. Evans*, 162 Cal. App. 4th 1157, 1169 (2008)).

14         SolarPark alleges that FACT publicized that SolarPark had "serious financial issues,"

15   "permanently ceased production," and "filed for bankruptcy," all false statements.  Park Decl.,

16   ¶ 39 (ECF 27-5 at 10).  These representations were made in FACT's Form S-4, which was filed

17   with the U.S. Securities and Exchange Commission on February 10, 2023, in the lead up to

18   Complete Solaria's creation.  SolarPark seeks to hold Solaria responsible on the theory that Solaria

19   made these false representations to FACT during its due diligence review ahead of the merger.  In

20   the instant motion, SolarPark seeks to generally enjoin Solaria from "[l]ibelously or slanderously

21   defaming Solar Park."  ECF 28-7 at 2.

22         Plaintiff makes no attempt to overcome the presumption against prior restraint and

23   accordingly does not establish that the potentially defamatory speech poses, as potentially

24   applicable here, a serious and imminent threat to a protected competing interest.  Further, at this

25   early stage of litigation, there has been no determination on the merits that there is actionable

26   defamation.  SolarPark does not overcome the presumption against prior restraint of speech.  The

27   Court therefore **DENIES** the requested defamation injunction.

28

1

**D.      Expedited Discovery**

2

In addition to seeking an injunction, SolarPark seeks expedited discovery to (1) ascertain

3

the identities of contract manufacturers used by Defendants to manufacture the PowerXT solar

4

modules, (2) obtain the production of documents and communications with the identified

5

manufacturers, (3) set depositions of Defendants' officers or employees with knowledge of the

6

aforementioned communications, and (4) obtain the production of documents relating to SolarPark

7

or its trade secrets which would reveal the extent of any past disclosure of the trade secrets.

8

Rule 26(d) of the Federal Rules of Civil Procedure provides that "[a] party may not seek

9

discovery from any source before the parties have conferred as required by Rule 26(f), except . . .

10

when authorized by these rules, by stipulation, or by court order."  Fed. R. Civ. P. 26(d).  Courts

11

within the Ninth Circuit generally apply a "good cause" standard in considering motions to

12

expedite discovery.  *Semitool, Inc. v. Tokyo Electron Am., Inc.*, 208 F.R.D. 273, 276 (N.D. Cal.

13

2002).  "Good cause may be found where the need for expedited discovery, in consideration of the

14

administration of justice, outweighs the prejudice to the responding party."  *Id.*  The following

15

factors are commonly considered by courts to determine whether there is good cause for expedited

16

discovery: "(1) whether a preliminary injunction is pending; (2) the breadth of the discovery

17

requests; (3) the purpose for requesting the expedited discovery; (4) the burden on the defendants

18

to comply with the requests; and (5) how far in advance of the typical discovery process the

19

request was made."  *Am. LegalNet, Inc. v. Davis*, 673 F. Supp. 2d 1063, 1067 (C.D. Cal. 2009);

20

*see also Apple Inc. v. Samsung Elecs. Co.*, Case No. 11-cv-1846-LHK, 2011 WL 1938154 (N.D.

21

Cal. May 18, 2011).

22

Here, "although there is a preliminary injunction motion pending, this factor alone does not

23

justify expedited discovery."  *Kayvan v. Pompeo*, No. 5:19-CV-08071-EJD, 2020 WL 553940, at

24

*2 (N.D. Cal. Feb. 4, 2020) (citing *Am. LegalNet*, 673 F. Supp. 2d at 1066).  As other courts have

25

noted, "expedited discovery is not automatically granted merely because a party seeks a

26

preliminary injunction."  *Am. LegalNet*, 673 F. Supp. 2d at 1066.  SolarPark's pending preliminary

27

injunction does not alone justify expedited discovery, but it weighs in favor of discovery to allow

28

for its enforcement.

United States District Court
Northern District of California

19

Second and fourth, the discovery sought by SolarPark is quite broad and would prove onerous for Solaria to comply.  The first discovery request, for instance, seeks identification of "all persons or entities with which [Solaria] has contacted, discussed, proposed, negotiated, or contracted for manufacturing shingled solar modules between April 1, 2016 and the present."  This includes assessing and collecting data related to several forms of conduct over the course of seven (7) years, which appears inherently broad and difficult to assess.  Moreover, this first request represents only a fraction of the discovery demands.  The requested discovery also includes expedited depositions of Solaria's executives, which exacerbates the burden on the company to comply.  Both of these factors weigh against granting expedited discovery on the scale requested. A more tailored, less onerous approach should address SolarPark's needs.

Returning to the third factor, SolarPark avers that this discovery is necessary "to ascertain the full extent of the disclosure of its trade secrets."  ECF 27-4 at 32.  The Court agrees that SolarPark needs this early discovery to uncover the identities of the Doe Defendants and potentially take action to restrain the use of its trade secrets by entities beyond Solaria. Additionally, because the Court grants in part Solaria's motion to stay, this discovery permits SolarPark to better protect its trade secrets during the stay.

Fifth, the request for expedited discovery is made well in advance of the typical discovery process.  But given that discovery in this case is unlikely to commence in the near term given the stay and responsive pleadings from Defendants, advance discovery is necessary to learn the identities of the other entities that may utilize the trade secrets.  Advance discovery is additionally necessary for purposes of enforcing the Preliminary Injunction discussed above.

Therefore, the Court will grant limited discovery to aid in the identification of Doe Defendants or any other entities involved in the potential misappropriation of SolarPark's trade secrets.  Defendants shall, within 14 days of the issuance of this Order, produce or make available to SolarPark's counsel the following items in their possession, custody, or control: all documents and communications, if any, exchanged between Solaria, Complete Solaria, their agents, or affiliates, and any manufacturer or potential manufacturer that describe or reference any of the mass-production trade secrets identified by SolarPark in Exhibit D to the Park Declaration.  *See*

20

1    ECF 28-5.  The documents or communications include all materials dated from October 6, 2018,

2    the date the TLA was executed, to present.  SolarPark may seek further discovery or further relief

3    following review of this initial batch of materials upon showing of further good cause.

**DEFENDANTS' MOTION TO DISMISS AND STAY**

4

5          Next, the Court must consider whether SolarPark's claims must be arbitrated under

6    SolarPark and Solaria's arbitration agreements in the MSA and TLA.

7    **A.        Legal Standard for Motion to Dismiss Arbitrable Claims**

8          A party bound to an arbitration agreement that falls within the scope of the Federal

9    Arbitration Act ("FAA") may bring a motion to compel arbitration and stay the proceeding

10   pending resolution of the arbitration.  9 U.S.C. §§ 3-4; *Lifescan, Inc. v. Premier Diabetic Servs.,*

11   *Inc.*, 363 F.3d 1010, 1012 (9th Cir. 2004).  The Ninth Circuit has interpreted Section 3 of the FAA

12   to grant courts the discretion to stay or dismiss claims that are subject to arbitration agreements.

13   *See Chappel v. Lab'y Corp. of Am.*, 232 F.3d 719, 725 (9th Cir. 2000) (dismissing claim under

14   Federal Rule of Civil Procedure 12(b)(6) where determination of the claim was "barred by [a]

15   valid and enforceable arbitration clause"); *see also Kam-Ko Bio-Pharm Trading Co. Ltd-*

16   *Australasia v. Mayne Pharma (USA) Inc.*, 560 F.3d 935, 940 (9th Cir. 2009) ("If the court finds

17   that an arbitration clause is valid and enforceable, the court should stay or dismiss the action to

18   allow the arbitration to proceed.").  That said, there is a "preference for staying an action pending

19   arbitration rather than dismissing it."  *MediVas, LLC v. Marubeni Corp.*, 741 F.3d 4, 9 (9th Cir.

20   2014).

21          The FAA provides that arbitration clauses "shall be valid, irrevocable, and enforceable,

22   save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C.

23   § 2.  Under the FAA, a trial court's role in assessing arbitrability is "limited."  *Chiron Corp. v.*

24   *Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000).  In assessing a motion to compel

25   arbitration, a court must first "resolve any challenge that an agreement to arbitrate was never

26   formed" and then "resolve any challenge directed specifically to the enforceability of [a]

27   delegation clause."  *Caremark, LLC v. Chickasaw Nation*, 43 F.4th 1021, 1030 (9th Cir. 2022).  A

28   delegation clause assigns "gateway questions of arbitrability" to the arbitrator, including whether a

United States District Court
Northern District of California

21

1    particular dispute arises out of the parties' agreement.  *Id.*  Where there is a valid delegation

2    clause, the court must compel arguments about the scope or enforceability of the arbitration

3    provision to the arbitrator.  *Id.*

4            Since arbitration is "strictly a matter of consent," a court may only order arbitration of a

5    particular claim "where the court is satisfied that the parties agree to arbitrate *that dispute*."

6    *Granite Rock Co. v. Int'l B'hd of Teamsters*, 561 U.S. 287, 297, 299 (2010) (emphasis in original).

7    Relatedly, the FAA does not authorize a court to compel arbitration of issues or parties not

8    covered in the arbitration agreement.  *E.E.O.C. v. Waffle House, Inc.*, 534 U.S. 279, 280 (2002);

9    *see AT&T Techs., Inc.*, 475 U.S. at 648 (citation omitted) ("[A] party cannot be required to submit

10   to arbitration any dispute which he has not agreed so to submit"); *Walsh v. Arizona Logistics, Inc.*,

11   998 F.3d 393, 395 (9th Cir. 2021) ("[T]he FAA . . . does not provide that agreements to arbitrate

12   are enforceable against nonparties").

13           When parties dispute the scope of the arbitration agreement, "any doubts concerning the

14   scope of arbitrable issues should be resolved in favor of arbitration."  *Balen v. Holland Am. Line*

15   *Inc.*, 583 F.3d 647, 652 (9th Cir. 2009) (citing *Moses H. Cone Mem'l Hosp. v. Mercury Constr.*

16   *Corp.*, 460 U.S. 1, 24-25 (1983)).  However, the court should deny a motion to compel arbitration

17   if "it may be said with positive assurance that the arbitration clause is not susceptible [to] an

18   interpretation that covers the asserted dispute."  *AT&T Techs., Inc.*, 475 U.S. at 650.

19   **B.    Motion to Dismiss Arbitrable Claims**

20           Solaria moves to dismiss Counts III and IV, as well as part of Counts V and VI, arguing

21   that these claims should be resolved by the arbitrator because they arise from or relate to the MSA

22   or TLA.  ECF 48 at 3, 6.  SolarPark does not dispute that valid, enforceable arbitration agreements

23   exist in the MSA and TLA.  ECF 48 at 9, 15.  Instead, it asserts that the claims do not arise out of

24   or relate to the contracts and that this Court cannot dismiss claims made against other Defendants

25   who are not parties to the arbitration agreements.  ECF 48 at 1, 6. The Court considers each of

26   these arguments in turn.

27   //

28   //

United States District Court
Northern District of California

**1.     Counts III and IV: Tortious Interference with Contractual Relations and Inducement to Breach of Contract.**

In Counts III and IV, SolarPark alleges that Complete Solaria and Does 1-10 tortiously interfered with, and induced Solaria to terminate, the MSA and TLA.  Compl. ¶¶ 61-63, 71-72. Solaria argues that these counts are arbitrable because they are based on Solaria's alleged breach of contract.  ECF 48 at 3.  However, these counts are not directed against Solaria.  *See* Compl. ¶¶ 56-74.  Counts III and IV allege wrongdoing by Does 1-10 and Complete Solaria, neither of whom were parties to the MSA or TLA.  *Id.*; ECF 1-1 at 2; ECF 1-2 at 2.

As Complete Solaria and Does 1-10 did not contract with SolarPark to arbitrate disputes, the Court accordingly cannot enforce the arbitration provisions of those agreements as to these Defendants.  *See Walsh*, 998 F.3d at 395 ("The FAA … does not provide that agreements to arbitrate are enforceable against nonparties").  Therefore, the Court **DENIES** the motion to dismiss Counts III and IV.  However, as discussed below, these counts may be subject to a stay.

**2.     Counts V and VI: California's Unfair Competition Law and Civil Conspiracy**

In Count V, SolarPark alleges that all Defendants are liable under California's Unfair Competition Law ("UCL") based on violations enumerated in the complaint, including (1) tortious interference with the TLA and MSA, (2) misappropriation of SolarPark's trade secrets, and (3) publication of defamatory statements.  Compl. ¶¶ 77-79.  In Count VI, SolarPark alleges that Defendants are liable for civil conspiracy for the same conduct – that is, Defendants allegedly conspired to (1) tortiously interfere with the TLA and MSA, (2) misappropriate SolarPark's trade secrets, and (3) publish defamatory statements.  Compl. ¶¶ 84-87.

Solaria seeks to dismiss only the portions of Counts V and VI that allege tortious interference and inducement to breach the TLA and MSA, arguing that because the allegations arise from the contracts, the claims are subject to arbitration.  ECF 48 at 6.  In response, SolarPark asserts that the claims are beyond the scope of the arbitration agreements, noting that the arbitration provision in the TLA is narrow.  ECF 38 at 11, 16-19.

Before the Court may consider the scope of the arbitration agreements, however, it must determine whether it has the authority to do so.  Courts generally retain authority to resolve

23

1    whether a particular dispute is subject to arbitration, but "parties may delegate threshold

2    arbitrability questions to the arbitrator, so long as the parties' agreement does so by 'clear and

3    unmistakable' evidence." *Henry Schein, Inc.*, 139 S. Ct. at 530 (citation omitted); *see Rent-A-Ctr.,*

4    *W., Inc. v. Jackson*, 561 U.S. 63, 69 (2010). The Ninth Circuit has explicitly held that

5    incorporation of a set of arbitration rules that delegate the question of arbitrability to the arbitrator

6    may "constitute[] clear and unmistakable evidence that contracting parties agreed to arbitrate

7    arbitrability." *Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015); *see also Oracle Am.,*

8    *Inc. v. Myriad Grp. A.G.*, 724 F.3d 1069, 1075 (9th Cir. 2013) (holding that where "an arbitration

9    agreement is between sophisticated parties to commercial contracts, those parties shall be expected

10   to understand that incorporation of the UNCITRAL rules delegates questions of arbitrability to the

11   arbitrator").

12            The arbitration agreements in this case do not contain language explicitly delegating

13   threshold issues of arbitrability to the arbitrator. However, both the MSA and the TLA state that

14   the arbitration is governed by the rules of the Singapore International Arbitration Centre ("SIAC"),

15   thus incorporating those rules. MSA § 18.4 (ECF 1-1 at 19); TLA § 10.2 (ECF 1-2 at 12). Under

16   SIAC's rules, the arbitrator has the authority to decide "its own jurisdiction, including any

17   objections with respect to the existence, validity or scope of the arbitration agreement."

18   Arbitration Rules of the Singapore International Arbitration Centre, SIAC Rules 6th Edition, 1

19   August 2016, R 28-2 (ECF 48-2 at 27). SolarPark and Solaria are sophisticated parties to

20   commercial contracts and thus are expected to understand that incorporating the SIAC rules

21   delegates arbitrability questions to the arbitrator. *See Oracle*, 724 F.3d at 1075. Accordingly, the

22   scope of the arbitration agreement is a question for the arbitrator and is not appropriate for this

23   Court to consider. *See id.*; *Brennan*, 796 F.3d at 1130-31; *McEnery v. McEnery*, 621 F.Supp.3d

24   1059, 1064 (N.D. Cal. 2022).

25            Rather than dismissing these counts as Defendants request, the Court **STAYS** Counts V

26   and VI against Solaria pending arbitration of the derivative causes of action. *See MediVas, LLC*,

27   741 F.3d at 9 (noting the Ninth Circuit has a "preference for staying an action pending arbitration

28   rather than dismissing it").

United States District Court
Northern District of California

24

1

2      **3.      Motion to Stay the Remaining Claims**

3          Solaria seeks to stay all the remaining claims they did not move to dismiss.  ECF 32 at 17.

4      Under Title 9 U.S.C. § 3, "a federal court must stay its proceedings against a party bound to an

5      arbitration agreement subject to the FAA."  *Cisco Sys., Inc.*, 462 F. Supp. at 1036.  Distinct from

6      Title 9 U.S.C. § 3's statutorily mandated stay, district courts have the "discretionary power to stay

7      proceedings."  *Lockyer v. Mirant Corp.*, 398 F.3d 1098, 1109 (9th Cir. 2005) (citing *Landis v. No.*

8      *American Co.*, 299 U.S. 248, 254 (1936)).  Courts may stay litigation even as to non-arbitrating

9      parties "as a matter of its discretion to control [their] docket[s]."  *Moses*, 460 U.S. at 20 n.23; *see*

10     *Cisco Systems, Inc.*, 462 F.Supp.3d at 1036.  The Ninth Circuit has a "preference for proceeding

11     with the non-arbitrable claims when feasible."  *United Commc'ns Hub, Inc. v. Qwest Commc'ns,*

12     *Inc.*, 46 F. App'x 412, 415 (9th Cir. 2002).  However, a stay is generally "appropriate where the

13     arbitrable claims predominate, or where the outcome of the nonarbitrable claims will depend upon

14     the arbitrator's decision."  *Id.*  A court may "find it is efficient for its own docket and the fairest

15     course for the parties to enter a stay of an action before it, pending resolution of independent

16     proceedings which bear upon the case."  *Dependable Highway Exp., Inc. v. Navigators Ins. Co.*,

17     498 F.3d 1059, 1066 (9th Cir. 2007) (quoting *Leyva v. Certified Grocers of Cal. Ltd.*, 593 F.2d

18     857, 863-64 (9th Cir. 1979)). "This rule applies whether the separate proceedings are judicial,

19     administrative, or arbitral in character, and does not require that the issues in such proceedings are

20     necessarily controlling of the action before the court."  *Leyva*, 593 F.2d at 863-64.

21          In determining whether to grant a stay under its inherent authority, courts weigh

22     "competing interests," including (1) the possible damages from granting a stay; (2) the hardship or

23     inequity to a party if required to litigate; and (3) how a stay would affect the "orderly course of

24     justice," including whether a stay will simplify or complicate issues in the pending litigation.

25     *Lockyer*, 398 F.3d at 1110 (citing *Landis*, 299 U.S. at 268).

26                **a.      Damage Resulting from Granting a Stay**

27          The Court begins its analysis of the *Landis* factors by analyzing whether SolarPark will

28     suffer damages from staying this litigation.  Courts may issue a stay if "it appears likely the other

       proceedings will be concluded within a reasonable time in relation to the urgency of the claims

25

1    presented to the court." *Lockyer*, 398 F.3d at 1111 (citation omitted).  In general, a court should

2    not a grant a stay "unless it appears likely that the other proceedings will be concluded within a

3    reasonable time." *Leyva*, 593 F.2d at 863-64.  Courts "are generally unwilling to presume delay is

4    harmful without specific supporting evidence." *Aliphcom v. Fitbit, Inc.*, 154 F. Supp. 3d 933, 938

5    (N.D. Cal. 2015).  However, courts have "relied on delay as a reason to deny a stay where the

6    plaintiff is seeking injunctive relief and a delay of months or years would allow the defendant to

7    continue infringing on a patent . . . [or where] a delay will result in the loss of documentary or

8    testimonial evidence." *Id.*

9          Solaria asserts that "no possible damage . . . could result" from granting a stay.  ECF 32 at

10   20.  In opposing the motion to stay, SolarPark argues that it will suffer harm because a stay would

11   "impair [SolarPark's] ability to get injunctive relief" as the arbitration is currently scheduled for

12   early 2024 and could be delayed if additional claims or parties are joined.  ECF 38 at 22-23.  Here,

13   Solaria does not seek an "especially lengthy" or "indefinite" stay, as the arbitration is scheduled in

14   seven months.  *See SST Millennium LLC v. Mission St. Dev. LLC*, No. 18-CV-06681-YGR, 2019

15   WL 2342277, at *4 (N.D. Cal. June 3, 2019) (citing *Yong v. I.N.S.*, 208 F.3d 1116, 1119 (9th Cir.

16   2000)); *Aliphcom*, 154 F. Supp. 3d at 938 ("any generalized risk of delayed litigation is

17   minimized" by the fact that the alternate proceeding was moving forward expeditiously, with a

18   trial set for five months later).  Further, the harm SolarPark might suffer from a delay in obtaining

19   injunctive relief for infringement of trade secrets is mitigated by this Court's order granting the

20   preliminary injunction.  The timing of the arbitration combined with the interim relief weighs in

21   favor of granting the stay while the parties proceed to arbitration in Singapore.

22         SolarPark adds that even if a preliminary injunction were granted, "there is a real risk that

23   key evidence may be lost" due to the delay caused by a stay of these proceedings.  ECF 38 at 22.

24   Without providing any examples of what evidence may be lost or how, this conclusory argument

25   fails to persuade.  Further, to the extent that any evidence could be lost by delay, that possibility is

26   mitigated by the upcoming arbitration and by the Court's grant of expedited discovery discussed

27   above.  The first *Landis* factor weighs in favor of granting a stay.

28

**b.**       **Hardship or Inequity Party May Suffer if Forced to Litigate**

The Court next considers "the hardship or inequity which a party may suffer in being required to go forward." *See Lockyer*, 398 F.3d at 1110 (citations omitted).  If there is "even a fair possibility" that the stay will cause harm, the moving party must show a "clear case of hardship or inequity." *Id.* (citing *Landis*, 299 U.S. at 255).  Courts have found that there may be hardship when denying a stay would cause both parties to litigate claims that could result in "inconsistent rulings."  *Vance v. Google LLC*, No. 5:20-CV-04696-BLF, 2021 WL 534363, at *5 (N.D. Cal. Feb. 12, 2021) (citation omitted).

Solaria argues that proceeding with the present case will "waste judicial resources and be burdensome on the parties" because the arbitrator will be conducting a "substantially parallel" and identical discovery process.  ECF 32 at 20 (citing *Leyva*, 593 F.2d at 864).  SolarPark responds that "the misappropriation and defamation claims do not depend on the arbitrator's decision." ECF 38 at 24.

However, many of SolarPark's claims here rely on allegations that Solaria breached its contractual duties with SolarPark, claims which are being arbitrated.  ECF 32 at 20.  Although SolarPark also alleges claims against non-signatory defendants, these claims are inseparable from the claims against Solaria, and denying a stay could "undermine the arbitration proceedings."  *See SST Millennium LLC*, 2019 WL 2342277 at *5 (quoting *Hill v. G.E. Power Sys., Inc.*, 282 F.3d 343, 347-48 (5th Cir. 2002)).  Further, proceeding with the litigation would require both parties to "expend significant resources" litigating the claims, which courts in this district have found to "weigh slightly in favor" of granting a stay.  *See Lal v. Cap. One Fin. Corp.*, No. 16-CV-06674-BLF, 2017 WL 282895, at *3 (N.D. Cal. Jan. 23, 2017); *Vance*, 2021 WL 534363 at *5.  The second *Landis* factor thus also weighs in favor of granting a stay.

**c.**       **Effect of a Stay on the Orderly Course of Justice**

In determining whether a stay promotes the orderly course of justice, courts consider "the degree of overlap in factual allegations . . . to avoid unnecessary duplicative litigation."  *SST Millennium LLC*, 2019 WL 2342277 at *5 (citing *Leyva*, 593 F.2d at 863).  A stay is appropriate where the outcome of the claims will depend on the arbitrator's decision.  *United Commc'ns Hub,*

*Inc.*, 46 F. App'x at 415; *see Lockyer*, 398 F.3d at 1110 (noting that a stay may be warranted where it will help simplify issues of fact or law).  Indeed, "[j]udicial economy . . . is the primary basis courts consider when ruling on motions to stay."  *Vance*, 2021 WL 534363 at *5.  Preserving the resources of the court "will also preserve those of both parties involved while simultaneously allowing them to tailor discovery and avoid duplicative or unnecessary tasks."  *Fuller v. Amerigas Propane, Inc.,* No. 09-2493 TEH, 2009 WL 2390358 at *2 (N.D. Cal. Aug. 3, 2009).

SolarPark argues that the arbitrable claims "do not predominate" because "only 2 of the claims are related to the termination of the contracts" and the misappropriation and defamation claims do not rest on the arbitrator's decision.  ECF 38 at 24-25.  Solaria counters that there are overlapping facts and the potential for overlapping discovery.  ECF 48 at 8-9.

The Court agrees with Solaria that the issues to be resolved in this case and in the arbitration contain overlapping facts and issues.  The determination of whether Solaria breached its contracts with SolarPark will impact the outcome of Counts III and IV, as well as parts of Counts V and VI.  *See* ECF 32 at 17-18.

Tortious interference with contractual relations, one of the substantive violations underlying Counts III, IV, V, and VI, requires "(1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of that contract; (3) the defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage."  *Ixchel Pharma, LLC v. Biogen, Inc.*, 9 Cal. 5th 1130, 1141 (2020); *see Pac. Gas & Elec. Co. v. Bear Stearns & Co.*, 50 Cal. 3d 1118, 1126 (1990).  Thus, assessing the merits of these claims requires determining whether Solaria breached its contracts with SolarPark.  SolarPark and Solaria specifically agreed to arbitrate that issue, and they also agreed to allow the arbitrator to determine the proper scope of the claims before it, which may or may not include related claims arising from any breach.  *See* MSA § 18.4 (ECF 1-1 at 19); TLA § 10.2 (ECF 1-2 at 12).

Moreover, contrary to SolarPark's arguments, the claims for misappropriation of trade secrets rely on allegations about the MSA and TLA, including whether Solaria breached its contractual obligations to maintain the secrecy of SolarPark's manufacturing IP.  *See* Compl.

United States District Court
Northern District of California

¶¶ 43, 45.  As the arbitration proceedings "bear upon the case," a stay is warranted.  *See Dependable Highway Exp., Inc.*, 498 F.3d at 1066 (citing *Leyva*, 593 F.2d at 863-64).  Having weighed these factors and considering the totality of the circumstances, the Court exercises its discretion to issue a stay pending the outcome of the arbitration.

## CONCLUSION

For the forgoing reasons, the Court hereby rules as follows:

1. Defendants' Motion to Dismiss is **DENIED**.

2. Plaintiff's Motion for Preliminary Injunction is **GRANTED** in part and **DENIED** in part.

    a.  The Court **ORDERS** that Defendants Solaria and Complete Solaria, and all persons or entities acting under, in concert with, or for any one of them, or anyone who receives actual notice of this order, are hereby restrained and enjoined from any and all use, disclosure, providing third parties access to, transferring, copying, duplication, reproduction, publication, distribution, broadcasting, or marketing of any version of SolarPark's trade secrets as defined in SolarPark's Identification of Trade Secrets pursuant to California Code of Civil Procedure Section 2019.210.  Park Decl., Ex. D (ECF 28-5).

    b.  SolarPark is not required to post a bond for the issuance of this Preliminary Injunction.

    c.  This Preliminary Injunction shall remain in full force and effect through the date on which judgment is entered following the trial of this action. This Preliminary Injunction shall become immediately effective upon its entry.

    d.  The Court **ORDERS** Solaria and Complete Solaria, within 14 days of the issuance of this Order, to produce or make available to SolarPark's counsel of record all documents and communications in their possession, custody, or control, if any, exchanged between Solaria, Complete Solaria, their agents, or affiliates, and any manufacturer or potential manufacturer that describe or reference any of SolarPark's mass-production trade secrets, as identified by SolarPark Identification of Trade Secrets pursuant to California Code of Civil Procedure Section 2019.210.  Park Decl., Ex. D (ECF 28-5).  The documents or communications shall include all materials dated from October 6, 2018, to present.  The Court invites the parties to submit a stipulated protective order in accordance with the Civil

1  Local Rules and this Court's Civil Standing Order to facilitate the production of potentially

2  sensitive materials.  Any such stipulation should be submitted for the Court's approval

3  within seven days from the date of this Order.

4  e.  The Court **DENIES** Plaintiff's motion to enjoin allegedly defamatory speech.

5  3.  The Court **GRANTS** Defendant's motion to stay the litigation pending the arbitration.

6  **IT IS SO ORDERED.**

7  Dated: August 2, 2023

8

9

10  **ARACELI MARTÍNEZ-OLGUÍN**
    **United States District Judge**

11

United States District Court
Northern District of California

30